## IN THE MATTER OF PETITION OF ORESTES CLEVELAND, MAYOR OF JERSEY CITY.

1. A statute authorizing the mayors of all the cities in the state to appoint the principal municipal officers, such act to take effect in such cities as shall accept it at a popular election, declared to be constitutional.

2. The fact that divers results may flow from the execution of granted powers of local government does not render the enabling statute special or local. If the same powers are bestowed upon all municipalities of the same class, the law is general.

3. The statute authorized the respective mayors of the cities, by proclamation, to call an election to decide upon the acceptance or rejection of the act. *Held,* that in case the mayor was absent, and the charter, in such contingency, vested the powers of the mayoralty in a specified officer, such officer could proclaim the election. ·

4. A misrecital of some of the provisions of the act in the proclamation of an election, held not devoid of legal effect, the act not requiring their insertion in the proclamation, and there being nothing to show that the error affected the result of the election.

5. It is competent for the legislature to provide for the speedy determination of the controversies relating to municipal offices, the statute securing to the incumbents of such offices the same rights, in substance, that they would have had if the procedure had been by *quo warranto.*

Writ of error to Supreme Court.

The opinion of the Supreme Court is reported in 22 *Vroom* 319.

For the plaintiffs in error, *R. B. Seymour* and *Gilbert Collins.*

For the defendants in error, *W. D. Edwards* and *Leon Abbett.*

The opinion of the court was delivered by

VAN SYCKEL, J.  An act entitled "An act concerning the government of cities of this state," approved April 6th, 1889, vests in the respective mayors of the cities of this state the power to appoint the chief municipal officers in substitution for the previously existing methods of appointment.

The law is made operative only in cities which elect to accept it, the provision therefor being as follows: " That the board of aldermen or common council of any city may, by resolution, or the mayor of any city may, by proclamation, submit the question of the acceptance or rejection of this act to the voters of such city at any general or charter election to be held therein, whereof at least two days' notice shall be given by public advertisement in two daily newspapers circulating in such city, and if a majority of those who shall vote for the acceptance or rejection thereof shall be in favor of the acceptance of this act, then this act shall go into effect immediately, and the grant of power herein made to any such city shall be

deemed to be accepted by such city, and such city shall be bound by the terms of this act; provided, however, that no election shall be held under the provisions of this act after the first day of October, eighteen hundred and ninety."

At an election held in Jersey City, a majority of the popular vote was cast for the acceptance of this act, and thereupon the mayor, pursuant to its provisions, filled the municipal offices.

This litigation was instituted by the prior incumbents, who contest the validity of the statute, as well as the legality of the election held under it.

That a law granting municipal powers may be enacted to take effect only on acceptance thereof by the people of the municipality, has been too firmly established in this state to be a debatable question. *City of Paterson* v. *Society,* 4 *Zab.* 385; *State* v. *Morris Pleas,* 7 *Vroom* 72; *Warner* v. *Hoagland,* 22 *Id.* 62; *Paul* v. *Gloucester County,* 21 *Id.* 585.

In the nature and theory of local government, it seems to me that it must necessarily be so. I cannot see how, upon principle, it can make any difference, whether the legislative enactment gives every city power to appoint its officers in such manner as it may elect, or provides a specific mode for appointment in every city that may choose to adopt it. The latter is as absolute a declaration of the legislative will, and as complete a law, as the former. In the one case, as fully as in the other, the legislative act confers upon the people of the locality the power to select the local officials. The vote does not make the law; it adopts the mode of government which the law submits to acceptance.

Whenever a legislative act, no matter how specific or how general it be, puts it within the power of any political district to exercise a function of local government, such legislation is a complete and perfect declaration of the legislative will, and is not obnoxious to the charge that it delegates the lawmaking power. It is the subject to which it relates that gives it the character of valid legislation. The form in which it is presented for acceptance is wholly immaterial, so long as it

does not contravene the organic law in respect to special or local laws.

The alleged vice in the law, mainly relied upon to overthrow it, is, that it is local and special, and therefore proscribed by our constitutional provision.

In this argument, it is an obvious and fundamental fact (which must be ever present in mind, if we would not be misled), that the grant of powers of local government inevitably leads to diversity. The object of delegating powers is to enable local governments to make such divers laws as they may deem expedient.

The grant of such powers implies that diversity is requisite. If uniformity was to be preserved, the legislature would establish an inflexible and uniform code for all localities, leaving nothing optional. If we hold that the fact that diversity arises out of the use or application of a legislative act, is destructive of its validity, we must affirm that the constitution of our state, in its present form, absolutely forbids the delegation of powers of local government. Such a proposition, I think, no one will seriously advocate.

Uniformity in results cannot co-exist with the right of local self-government until all men shall be of one mind. No one will assert that an act is local or special which gives to all the cities of this state the right to establish, by ordinance, the mode in which their subordinate officers shall be elected.

Under such a statute, one city might make the tenure of office a term of years, another during good behavior, and a third at the will of the common council. Such divers results in the execution of the granted power, obviously, could not outlaw the act of the legislature. The authority granted to all is the same ; the dissimilarity is in its use—a dissimilarity inherent in the idea of local government.

The uniformity exacted by the constitutional mandate must be sought for, not in the results which flow from the free, unhampered exercise of the granted power of local government, but in the fact that every locality is afforded a like right to adopt and exercise, in its own way, the same powers

which are bestowed upon every other like political body. To the one no privilege must be offered for acceptance which is not extended to the other. The authority given must be the same; it may be executed in a different way, or in the same way, at the option of the recipient. That is the uniformity to which the judicial declarations in the adjudged cases in this state must be referred. One of the conspicuous evils at which this constitutional amendment was aimed, was, in my judgment, this: that prior to the amendment a few persons could go before the legislature and secure the passage of a special law to promote their own purposes, which might be obnoxious to the body of citizens. In such event, the only remedy was by an appeal to a subsequent legislature, and that might be too late to wholly repair the mischief. Such enactments are now forestalled by the fact that they cannot be made applicable without being submitted to the approval of the entire body of voters. In this way the people of every city are left free to select the mode in which they will regulate and conduct their local affairs, and it is this which impresses such legislation with the character of general, and not special, legislation. Gauged by this standard, there is no infirmity in the legislation which is the subject of this controversy. It applies to the entire class; there is no exception. It is held out to the free acceptance of all, and is capable of being accepted or rejected by every city in the state.

In determining whether an act is general or special, we must regard the time of its enactment. If it applies to all cities then in existence, it seems to be a contradiction, in terms, to say that it is special. To be special, it must exclude some; if it excludes none, and expressly embraces all, it must be general.

But it is insisted that, although the language used in the statute is general in form, it is so framed that it can apply only to cities having a comptroller, treasurer, collector and the other officers named in the various sections of the act. Jersey City, it is alleged, is the only city in the state which has all the officers named by the names and titles given in the act.

Conceding this to be so, the assumption that this legislation can apply to no other city rests upon a manifest misapprehension of its terms.

In 1878, the legislature passed an act repealing all acts providing for the appointment of commissioners by the senate and general assembly to regulate municipal affairs. It was conceded that this act affected Jersey City only, and for that reason its constitutionality was challenged, in *Van Riper* v. *Parsons*, 11 *Vroom* 123. Mr. Justice Dixon, in an opinion, the soundness of which has never been questioned, upheld this law, although there happened to be but one individual of the class, or one place, where it produced effects. The rule he formulated, as applicable to this subject, is this: "A law, framed in general terms, restricted to no locality, and operating equally upon all of a group of objects, which, having regard to the purposes of the legislation, are distinguished by characteristics sufficiently marked and important to make them a class by themselves, is not a special or local law, but a general law."

This subject was reviewed in this court in *Hammer* v. *State*, reported in 15 *Vroom* 667. Chancellor Runyon, who delivered the opinion of the court, draws so clearly the line of demarcation between acts of this character which are valid and those which are unconstitutional, that there can be little difficulty in classifying them. He says: "The evil which it was intended to remedy was the making of changes by the legislature in the system of government of municipalities, sometimes at the instance of only a few, and perhaps to the detriment of the many; changes which were not only frequent and disturbing, but often prejudicial to good government and the interest of taxpayers. * * * Normally, there can be, under our constitution, no such thing as local or special legislation to regulate the internal affairs of municipalities, but all legislation to that end must be general and applicable alike to all. Nor can any departure from the rule be justified, except where, by reason of the existence of a substantial difference between municipalities, a general law would be inappro-

priate to some, while it would be appropriate to and desirable
for others.   There it would be warranted, not only by the
necessities of the situation, but by a reasonable construction
of the constitution."

The act under consideration in that case applied, at most,
only to three cities, namely, those " having a board of assess-
ment and revision of taxes," and attempted to legislate the
existing officers out of office.

This court held that the fact that taxes are assessed by a
board of assessors in one or more municipalities did not con-
stitute such a difference between those municipalities and the
others, where the taxes are assessed by individual assessors, as
to warrant the legislature in specially interfering in the affairs
of the former to such an extent as it attempted to do.   All
local governments have, necessarily, assessors of taxes, and
therefore the mere name by which such officers are designated
cannot constitute a substantial basis for classification.

I quote further from the opinion of Chancellor Runyon in
the Hammer Case, to show that this court rested its decision
upon the specific reason above given, and that it intended to
exclude the inference that it was to have a wider application.
Chancellor Runyon says : " To justify separate legislation for
towns or counties, there must be something in the subject
matter of the enactment to call for and necessitate such legis-
lation ; as, for example, there are, in certain cities, officers,
such as superintendents of wharves, &c., who exercise func-
tions peculiar to such cities.   There, if the legislature inter-
feres at all in reference to such officers on the subject of their
functions, it must be by legislation not appropriate to other
towns, and, therefore, in such cases, and to that extent, sep-
arate legislation would be proper.   But the assessment and
revision of taxes is not peculiar to towns which have boards
of assessment and revision ; they are common to all."   There
can be no doubt that if the act of April 5th, 1878, had
provided that all assessors, as well as members of boards of
assessment and revision of taxes, should be appointed as in
that act directed, it would have been upheld in the Hammer

Case. Its vice was found in the fact that it did not include officers who performed duties like to those of boards of assessment and revision of taxes, and did not, therefore, apply to the entire class.

If we follow the true line marked out in the cases cited, I think we cannot fail to distinguish between the principal case and that of Hammer *v.* State, and the unreported case of Mc-Dermott *v.* Seymour.

The first section of the act of March 18th, 1889, provides, "that in the cities in this state, the mayors thereof, respectively, shall appoint all city comptrollers, city treasurers and city collectors, in lieu of and to be substituted for and to act in place of, and who shall in each case, respectively, be invested with and shall perform all the powers and duties of any such officers, by whatsoever title they may be designated, now authorized by law to act therein."

In the first place, it must be observed, that this section does not require that a comptroller, a treasurer and a collector shall be appointed by the mayor of every city. The language used is, not that in every city a comptroller shall be appointed, but in the cities of this state the mayor shall appoint all comptrollers. The meaning of it is, that in every city where there was an officer invested by law with the functions of a comptroller, no matter by what title he was designated, the mayor should have the power of appointing him. So with regard to a city treasurer and a city collector. The draftsman of the act was careful to exclude the idea that he intended to adopt, as a basis of classification, the mere name of the offices. He guardedly preserved the substance by providing that in every city the mayor shall appoint the officer who exercises these functions, without regard to the title by which he is designated in the previously existing law. In the minor cities of this state there is no officer corresponding to a comptroller; there is none invested with like duties. That is an office created by statute, with special duties, and adapted only to the necessities of the larger municipalities. Under this act, a comptroller would be appointed for Jersey City and Newark, but could

not be appointed for some of the lesser places. But this fact does not render the act special or local. A comptroller, like a superintendent of wharves, exercises functions peculiar to certain cities, a peculiarity existing by reason of previous laws. There, in the language of the Hammer Case, " if the legislature interferes at all in reference to such officers on the subject of their functions, it must be by legislation not appropriate to other towns, and, therefore, in such cases, and to that extent, separate legislation would be proper."

The second section of the act provides, that in lieu of the method of appointing or electing assessors or tax commissioners in any city, there shall be appointed by the mayor thereof a board of three tax commissioners. The duties and powers of these commissioners are clearly defined in the act. This, obviously, takes this case out of the rule which condemned the legislation in the Hammer Case. Every city in the state has either assessors or tax commissioners, and in every city, therefore, the appointment can be made.

One more reference will be sufficient to show the purport and effect of the act.

Section 6 provides, that in every city of this state the mayor thereof shall appoint a corporation counsel and a corporation attorney, who shall discharge the duties that now devolve upon similar officers and offices in each of such cities, respectively.

Looking at the entire act, I am of opinion that this section is fairly susceptible of the construction, that, in cities where there was, before the passage of this act, both a corporation counsel and a corporation attorney, both officers should be appointed by the mayor under this act; but where there was only a corporation attorney, that office alone was to be filled by the mayor. In such case, the corporation counsel would exercise functions peculiar to certain cities, and would, like a comptroller, be the appropriate subject of special legislation. But if this interpretation cannot be maintained, the result would be that both officers must be appointed, where but one previously existed. This might impose an unnecessary

burden, but that is a question of policy, and does not affect the constitutionality of the act.

In my judgment, the purport and effect of this enactment is, that all the cities of this state shall have the privilege of electing whether they will choose in the manner previously appointed by law, or by the appointment of their respective mayors, all those officers who perform the duties and functions of the officers specified in the said act, by whatever name they may be called in their respective charters. The grant of power is alike to all; nothing is conceded to one that is withheld from the other.

No one would challenge the validity of an act conferring upon all cities the right to choose their officers in such manner as might be ordained by the corporate body. A law is equally free from objection which permits an election between two specified modes of appointment. As has been shown, the test is, not whether diversity arises in the use of the granted power, but whether any of the class to which the legislation applies are excluded by the statute from the enjoyment of the powers and privileges which it grants.

The fact that some cities are not in a condition to accept the act, does not arise out of any special or local character of the act itself, but out of the dissimilarity of the various charters which came into existence before the recent amendments to the constitution.

If the test is, that every act submitted for acceptance must be equally applicable and beneficial to all localities, it will be impossible to frame statutes to be submitted for adoption which will not be infirm. The framers of the constitution could not have intended to apply such a test, otherwise provision would have been made for abrogating all the then existing charters, that a uniform system for local governments might be provided by subsequent legislation. The amendments were to be applied to legislation for cities with charters of the most dissimilar character.

It must have been apparent, upon the least reflection, that further legislation in the exigencies of the future would

In re Petition of Cleveland, Mayor.    *52 N. J. L.*

become necessary, and that precisely the same mode of executing powers could not be adapted to all cities. There appear to be but two methods of applying this amendment in accordance with any reasonable interpretation of its purpose.

The one is to repeal all charters and create strict uniformity; the other is to offer appropriate legislation to the acceptance of the entire class.

Experience has demonstrated the futility of attempting to secure the adoption of the former course. The latter method is in strict accordance with the theory of local government, affording the widest range for the exercise of the popular will in all local affairs. The fact that it is left by the statute to the discretion of the board of aldermen, or to the common council, or to the mayor of the city, to provide for an election, cannot affect the character of the legislation. That duty must be committed to some tribunal, and, so long as the like opportunity is given to all cities, the legislation is general, and not special. The local governments alone are responsible for a just exercise of discretion by their officials, and a want of it cannot be charged to the imperfection of the statute.

The necessity for submission to the expression of the popular will, in every case, will stand as a guard against vicious legislation under such a system. If that shall fail to be effective in some instances, the answer is, that no mind has been sufficiently astute to devise a scheme by which even its promoter could hope to secure the highest wisdom in the formulation of positive laws.

During the struggle which has been going on, while the law on this subject has been in a formative state, to find the true, practical solution of a question which is surrounded by many difficulties, our adjudications have tended to the result which has been reached in the judgment of the court below. In my opinion, that construction presents the only practicable view which can, in conformity to reasonable rules of interpretation, be taken of this branch of the fundamental law, and it should be adhered to. It cannot be rejected without overturning the previous decision of this court.

With regard to the proviso in section 33 of the act, that no election shall be held after October 1st, 1890, it need only be said that the decision of this case is in no way dependent on it. It is entirely separable from the body of the statute, and cannot taint or invalidate the main provisions, especially in view of the legislative declaration in section 28 : "That in case, for any reason, any section or provision of this act shall be questioned in any court, or shall be held to be unconstitutional or invalid, the same shall not affect any other section or provision of this act." All that is decided in this case is, that the mayor had power to fill the municipal offices in virtue of the act of April 6th, 1889.

I agree to the view taken in the court below as to the various objections which have been urged against the legality of the proceedings taken in Jersey City under this act, and also with regard to the supplemental act of April 19th, 1889.

The view of the Supreme Court on those questions is summarized as follows :

*First.* The statute of April 6th, 1889, authorized the respective mayors of the cities of this state, by proclamation, to call an election to decide upon the acceptance or rejection of the act. *Held,* that in case the mayor was absent, and the charter, in such contingency, vested the powers of the mayoralty in a specified officer, such officer could proclaim the election.

*Second.* A misrecital of some of the provisions of the act in the proclamation of an election, held not devoid of legal effect, the act not requiring their insertion in the proclamation, and there being nothing to show that the error affected the election.

*Third.* It is competent for the legislature to provide for the speedy determination of the controversies relating to the title of municipal offices, the statute securing to the incumbents of such offices the same rights, in substance, that they would have had if the procedure had been by *quo warranto.*

In my opinion, the judgment below should be affirmed.

MAGIE, J. (dissenting). As I have been unable to reach the conclusion arrived at by my associates, I deem it necessary to express, as briefly as possible, the chief reasons which, in my judgment, justify me in dissenting therefrom.

I entirely concur in the view that, prior to the late amendments of the constitution, it was within the power of the legislature to pass any act prescribing a form of municipal government or delegating municipal powers, to take effect and be exercised only on the acceptance of the act by the municipality affected thereby. But for those amendments, such an act would now be beyond question.

The amended constitution now requiring all legislation respecting municipal affairs to be general, the first question presented, when such legislation comes to be considered, is, Whether it is, in itself, and without reference to the form of the enactment, a general law, within the constitutional meaning. Are acts, the provisions of which are only to be operative in municipalities which accept them, general, or are they special and local?

These amendments to the constitution were plainly designed to establish and maintain uniformity in municipal affairs. The ideal aimed at in adopting these restrictions and requirements was a uniform system of municipal law, which for all municipal corporations, or at least for appropriate classes thereof, should (1) fix therein a form of local government with like officers, selected in the same mode and performing the same duties, and should (2) delegate to such corporations like powers of legislation over specified subjects. Acts producing diversity, in either respect cannot satisfy these requirements.

That the required uniformity may exist, although there may be diversity in use, must be conceded. A municipality need not be compelled to exercise every delegated power. Laws giving authority to municipalities to pave streets, to build sewers, to regulate the sale of dangerous articles, &c., would not lack the required generality because one municipality might exercise, and others might neglect or refuse to exercise, the powers conferred. If the same powers are con-

ferred to be exercised or not by each municipality, the uniformity intended will exist.

I further concede, that I am not able to perceive a substantial distinction, with respect to uniformity, between the direct delegation to a municipal corporation of powers of the character above indicated, to be exercised or not, and the delegation of the same powers, to be accepted or not, and, if accepted, to be exercised or not, by municipalities.

But legislation which deals with the form of municipal governments, in my judgment, differs widely and substantially from that which merely delegates powers to be exercised by such corporations.

Every existing municipal corporation possesses a form of government, by which the officers who are to exercise therein the delegated powers, the mode of their selection, and their powers and duties are fixed and prescribed. Acts which provide for different officers, or for officers differently selected, or for a different form of government, if operative only where accepted, will not produce uniformity. It is true that uniformity will result if every municipality accepts the proposed scheme, but if only one refuses, diversity continues. Such acts only give an option to municipalities to retain their old, or to accept the new, scheme. If one act, offering one optional scheme of government, is general, then other acts, each of which offers another optional scheme, or one act, which offers several schemes of government, each to be operative only in the municipality which shall accept it, must also be pronounced general. Under such acts, it is true, that all municipalities might accept one scheme and uniformity would result. But the vice inherent in such legislation, which renders it obnoxious to the constitutional prohibition in question, consists in the option of a choice between an existing and a new scheme, or between one and another new scheme, whereby diversity is not only rendered possible, but provided for.

Let us consider how such acts would appear if, in obedience to the express mandate of the constitution, a general law regu-

lating the internal affairs of municipalities had been passed, and were now in operation.

Such a law would provide for a uniform system of government for appropriate classes of municipalities, with like officers, selected in like modes and charged with like duties. It would also delegate to each of the class like powers of legislation on certain subjects, to be exercised by the people, or some legislative body representing the people. The law would, in itself, be complete.

Now, if afterward the legislature deemed that another subject ought to be committed to these local governments, an act delegating to all of the class of municipalities power to legislate thereon would unquestionably be general, although every one of the class might not be required to legislate, and might not, in fact, legislate thereon.

And if a subsequent act conferred on the same class such a power, to be operative only when the voters of any one of the class should accept it, I think it might well be pronounced general, for no diversity of power would be thereby created. In the former case, the delegated powers may be exercised or not, as deemed best by those empowered to exercise them; in the latter case, the power delegated is accepted or not, as deemed best by the voters. Uniformity of power exists; any resulting diversity grows out of the use, or non-use, of the power. If accepted, a new power is added to those previously enjoyed, from which none are taken away. The option is not between one power already enjoyed and another proposed, but is only to accept, or not accept, an additional power.

But if the scheme of government, established by such a general law as we have assumed to have been passed, provided, for example, that the legislative body, and all other officers of the municipality, should be elected by the people; if, thereafter, one act was passed providing that, in each municipality which should accept it, the legislative body should appoint all other officers; and another act was passed providing that, in each municipality which should accept it, the mayor should nominate and appoint all other officers with

the advice and consent of the legislative body ; and another act was passed providing that, in each municipality which should accept it, the mayor should appoint all other officers ; or one act was passed comprising all these provisions, could such acts stand the test of this requirement of the constitution? For my part, I can discover no argument which could be made in support of the validity of such acts.  They would, manifestly, break the uniformity established by the general law, and would permit and provide for a diversity which the clause in question was plainly designed to prohibit.  If invalid under the assumed circumstances, such acts must be equally invalid now.

This conclusion is not at all opposed to the view taken in Paul *v.* Gloucester.  As was lucidly shown in the opinion of Mr. Justice Van Syckel, the law then in question delegated one of the police powers—that of regulating or prohibiting the sale of intoxicating liquors—to political subdivisions of the state, and did not fail of being general because one county might regulate, and another might prohibit, such sale.  In this view I entirely agree, but it does not lead me to support legislation which substantially differs in that it leaves to municipalities an option—not to use, or to decline to use, a delegated power, but to adopt one or another of variant forms of government.

Such is the act before us, for it provides a partial scheme of government, variant from that now existing in cities, and permits each city to determine whether it will retain its old, or adopt the new, form.  For this reason, I think the law obnoxious to the constitutional prohibition.

But if this view of the act in question were incorrect, and if the legislature may constitutionally empower municipalities to adopt one or another of variant forms of government, and so retain a diversity which, it was supposed, the constitutional amendments were designed to remove, then a further question is presented, viz., Whether this act, in other respects, stands the constitutional test, and bears the character of a general law.

There can be no dispute at this day as to what is general legislation under the constitution. All the cases agree on these propositions, viz.: that an act respecting municipalities will be general when it operates on all municipal corporations which, with respect to its purposes, have distinguishing char-. acteristics rendering such legislation appropriate to them and inappropriate to others; and that an act which appropriately operates on some municipal corporations, but excludes from its operations others which have identical characteristics, and to which legislation for the same purpose would be equally appropriate, will not be general, but limited and special.

In dealing with acts of this sort, the generality of which is disputed, the province of the court is to settle whether they apply to and operate upon the whole class of municipal corporations to which such legislation is thus appropriate. Whether the legislation is judicious' or likely to effect its purpose is wholly within the province of the legislature. Thus, if an act proposes a remedy for circumstances which are treated as producing evil results in municipalities, we cannot consider whether the evil is actual or the remedy likely to be effective. But if municipalities, within which the same circumstances exist, and therefore the like evil (if it be an evil) results, and for which a like remedy is equally appropriate, are excluded from the operation of such an act, then the courts must pronounce it invalid because not general.

The predominant purpose expressed in this act is, to confer authority on the mayor of every city which adopts it to appoint all the principal officers who are now either otherwise appointed or elected by the people.

Let us test the generality of the act by reference to this alleged purpose:

It evidently involves a legislative determination that the present modes of selecting such officers either is in fact, or may be deemed by the voters in such cities to be, an evil, and the appointment of such officers by the sole act of the executive head of the corporation—the mayor—an improved plan and a remedy for the evil.

The act has therefore two aspects : it gives the power of appointment when the act is accepted, and it gives authority to accept. In both aspects it must be general and apply to every city. It must afford to each an opportunity to correct the assumed evil by accepting the new scheme, and securing the benefit of the new mode of appointment.

In dealing with the act in question, it is obvious that we are not concluded by general phrases giving power to all cities to accept its provisions. For if, on examining the act and comparing it with the charters of cities (which are before the court), it is manifest that the act cannot apply, and was intended not to apply, to all cities, then it must be the duty of the court to declare its invalidity, however general its language may seem to be. An express limitation to some cities would unquestionably be fatal to its validity. If a like limitation results from its necessary and inevitable operation, it must be presumed to have been intended, and ought to be equally fatal.

The act before us requires the mayors of the cities which accept it to appoint city comptrollers, treasurers and collectors, three tax commissioners, a corporation counsel, a corporation attorney, three street and water commissioners, four members of the board of finance, three commissioners of the sinking fund, three police commissioners, three fire commissioners and overseers of the poor.

The duties of some of these officers are defined in the act with some degree of particularity; the duties of others are left undefined, except by reference to the duties of such officers in the cities accepting the act, or by inference drawn from the name of the office.

It is obvious, therefore, that the act does not establish a complete scheme of municipal government. The evident intent is, that the act, wherever accepted, is to be operated with the form of government previously existing and prescribing official duties and functions. It is plain that any city accepting this act must contemplate continuing its municipal existence governed by its previously existing charter as modified

by this act.   If in any case the terms of the charter and of this act are so incongruous and incompatible that an acceptance would leave no form of government capable of being practically operated, it is absurd to say that a city so situated has an opportunity to avail itself of the remedy provided by this act in respect to the selection of its officers.   It is excluded therefrom quite as effectually as if it were excepted from its provisions by name.

I might here take up the details of this act and show what convinces my judgment that its provisions and omissions to provide respecting important and essential offices, place its proposed remedy beyond the reach of some, and render it incompatible with the municipal system of many cities.

But I deem it unnecessary to occupy more space.   An examination of the act, and a comparison of its provisions with those of every city charter in the state, discloses that there is but one city which has the line of officers for which this act provides a new mode of appointment.   In that city such officers, with identical titles, have powers and duties so defined that if this act is there adopted (as it has been), it makes a complete and congruous body of legislation.   Every other city has a variant system, administered by officers having different titles, performing different duties and exercising different powers, and so absolutely incongruous with the system prescribed by this act, that, if adopted, it would be practically incapable of administration and execution therein. It could not, therefore, be adopted in any such city.

The operation of the act is therefore necessarily limited, so far as its purpose is to give opportunity to cities to adopt the mode of appointment to office therein authorized, to that city alone with the charter of which it is congruous, and in which it is capable of execution, and is excluded from every other city in the state.   The act could no more effectually produce his result, if it had openly declared what was plainly intended (and, indeed, openly recognized), that it was designed to operate in that city alone, and to be an amendment to its charter.

Legislation which, couched in general terms, is by its conditions limited in operation to only a part of the class to which it professes to apply, may well be said to " palter with us in a double sense." Professedly general, it is designedly special.

The result is, that I have felt compelled to the conclusion that the act in question is not within the power of the legislature.

*For affirmance*—THE CHANCELLOR, DIXON, GARRISON, VAN SYCKEL, BROWN, CLEMENT, COLE, MCGREGOR, SMITH, WHITAKER. 10.

*For reversal*—MAGIE.