THE STATE, EX REL. JAMES A. DEMPSEY, v. THE MAYOR AND COMMON COUNCIL OF NEWARK.

1. The alteration of the wards of a city by special legislation is unconstitutional.

2. Such alteration is likewise unconstitutional, whether the same be effected by one statute or by the joint operation of two going into force successively.

3. The effect of the mistake in the description of the boundary of one of the assembly districts in the city of Newark, noticed by Beasley, Chief Justice.

On application for *mandamus*.

Argued at June Term, 1890, before BEASLEY, CHIEF JUSTICE, and Justices DIXON, REED and MAGIE.

For the relator, *E. L. Price, Theodore Runyon* and *Frederic W. Stevens.*

*Contra, Joseph Coult* and *Henry Young.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE.    The question presented in this instance for decision is, whether or not the recent act of the legislature, approved the 13th of April, 1889, relating to the co-ordination, in certain circumstances, of the boundaries of the wards of cities and those of assembly districts, be constitutional.

The pertinent section of that act is in these words : " That in any city of this state which now or hereafter shall contain more than two assembly districts within any such city, which assembly districts are completely and exclusively within the limits of such city and embrace no territory outside of such city, it shall be the duty of the mayor and common council, or other municipal board corresponding thereto, and such mayor and common council, or other municipal board of every such city, are hereby directed, by resolution, to divide such city into wards corresponding in number and boundaries to such assembly districts exclusively embraced as aforesaid within the limits of such city."

This act, according to its terms, went into effect immediately, but at that time there was no city in which it could operate, as there was no one containing " more than two assembly districts wholly within it."    On the 4th of July of the same year this requisite was supplied by the coming into operation of the act approved March 27th, 1889, and which rearranged the assembly districts of the state, creating wholly within the city of Newark several of such districts.    It produced this effect within no other city.

It will be observed, therefore, that the effect of this legislation, if it be enforceable, is to alter certain of the ward lines in the city of Newark, and that it has no effect whatever elsewhere.

Under these circumstances the mayor and common council has refused to divide, by resolution, according to the section of the act already cited, this city into wards corresponding in number and boundaries to those new assembly districts; hence the application for a peremptory *mandamus.*

In justification of this recusancy on the part of the city, its counsel insists that the legislative regulation so repudiated, applying as it does to the city of Newark alone, is void, on the ground that it is inconsistent with that particular provision of the constitution which prohibits local and special legislation regulative of the internal affairs of cities.

Before entering into the discussion of the subject thus presented, it seems to me proper to premise that there are two lines of argument, quite elaborately urged in behalf of the city, which have been altogether discarded. One of these is the attempt to show by an historical examination of a series of statutes relating to the city of Newark, that the present legislation is a designed contrivance fabricated by the lawmakers, in furtherance of an illegitimate purpose, to violate the constitutional provision in question; and, in the second place, that the policy of the acts thus criticised are adverse to the public well being.

It will require but little reflection to satisfy any one that such considerations as these are wholly foreign to the inquiry before us. The legislature is a branch of the government co-ordinate with the judiciary, and it would be both highly indecorous as well as highly illegal for either to criticise in a moral point of view the conduct of the other. On such occasions as the present, the sole and exclusive question is, whether the given legislation is consistent or not with constitutional requirements—an inquiry that cannot be forwarded in the least degree by a knowledge of the purpose, whether good or bad, that led to its enactment. And in like manner a decision of the question, whether the policy embodied in a statute be consistent or inconsistent with the public welfare, is in no wise a judicial, but altogether a legislative function. Consequently, in matters of this kind, it must be assumed, as postu-

lates not to be questioned, that the challenged statute was passed from proper motives, and that if put in force it will be conducive to the well being of the community.

Passing these irrelevancies, I find three important subjects discussed in the briefs before me. These subjects are—*first,* the question whether the legislation now in question is local and special in the constitutional sense; *second,* if it be such, is it within the interdiction of the constitution, and, *third,* what is the effect of a certain alleged imperfection of the Assembly District act—an imperfection which will be specified in the sequel.

These questions will be briefly considered in the order in which they are thus stated.

*First.* Is this legislation "special" in the constitutional sense of that term?

On the part of the city of Newark it is insisted that this question must be answered in the affirmative, inasmuch as the act affects the political organization of that city only.

That the statute has, under present circumstances, no scope beyond this, cannot of course be denied; for there is no other city in the state that has more than two assembly districts wholly within its boundaries, and that is the quality of the situation that calls into operation the statutory regulation now impugned.

That an alteration of the boundaries of the wards of a city constitutes a regulation of its internal affairs, is a proposition that is entirely indisputable; nor is any attempt made in the argument in this case to put it in question, for the contention of the counsel of the relator is, that upon the assumption of this statute having the effect thus ascribed to it and that at present its operation is localized in this particular city, nevertheless it is, in point of law, a general and not a special act.

In support of this position the course of reasoning was to this effect, viz., that this law, according to its terms, is made applicable to every city in the state, and that although it is at the present moment operative in the city of Newark alone, that under future legislation recasting the assembly districts

it may become operative in other places, and that when the law in question went into effect there was no place in the state which it affected; and that being then constitutional, it could not be bereft of such legality for the reason that the Assembly District act subsequently caused it to be operative in the city of Newark alone.

That the statute under consideration when it first went into force was constitutional, may well be conceded; the system it established was a general one, and by appropriate legislation might have been established in every city in the state, and under such circumstances the legislation would have been plainly unobjectionable. But it is manifest, being in its inceptive stage absolutely inert, it was possessed of a potentiality of becoming, in effect, either general or special, as extrinsic legislation might dictate, and the inquiry therefore supervenes, what is the constitutional complexion of the statute when such extrinsic legislation has imparted to it a purely local and special force? Primarily, it was possessed of no operative force; now, with the assistance of the Assembly District act, it has force in the city of Newark alone. Granting validity to these two statutes, it is plain that by their co-operation the internal affairs of this city will be subjected to a special and exclusive regulation. As this end, it is conceded, could not be accomplished by the force of a single statute, the question at this point to be passed upon is, whether it can be accomplished by the concurrent force of two or more.

It does not seem to me that the affirmative of this proposition can be reasonably maintained. Constitutional provisions are not to be subtly treated, nor construed in the narrow sense of their letter, but liberally, according to their manifest purpose and spirit. Nothing can be more conspicuous than that, by the constitutional provision under criticism, it was intended that when the internal affairs of a city could be regulated by a general law, they should be so regulated; and in every such case special regulation was prohibited, whether such regulation be effected by one statute or by many. The nature and pernicious qualities of such special legislation are the same,

whether it be embodied in a single statute or in a multiplicity of statutes. In the present instance the forbidden transaction has been produced by the conjoint action of these two statutes, and, consequently, it is that duplex legislation that is interdicted. This constitutional provision is a regulation of the legislative power in whatever form or forms it may exert itself, whether directly through the instrumentality of a single statute, or indirectly by the co-efficiency of several. I unhesitatingly conclude, on this point, that the legislation now in question is liable to precisely the same constitutional objections as it would have been had the force inherent in these two acts been deposited in one of them.

But it was insisted that upon the admission of the correctness of this view, nevertheless, this legislation is no more special than that which received the sanction of the Court of Errors in *Paul* v. *Gloucester County*, 21 *Vroom* 585. This is what is known as the Local Option case. But if we pay attention to the legal principles respectively applied in the present case and in the reported case, we will at once perceive that the two have no analogy to each other. In the instance in hand a statute general in its terms has been made special and localized in its operation by the legislature itself, by force of a second statute; whereas, in the reported case, the statute being also general according to its terms, was made special and local by the independent action of the people of the several localities. In the one case the legislation, by its own intrinsic force, is special; in the other, intrinsically considered, it was general. The reported case, and others of the same class, have manifestly no affinity, in point of legal basis, with the case now under examination.

Concluding, then, that this legislation is special, and that it regulates the internal affairs of the city of Newark alone, the second of the questions above stated arises: Is such legislation within the interdiction of the constitution?

It will be observed that the inquiry here is, whether the legislature cannot by a special law alter the boundaries of certain of the wards of the city of Newark.

When the case of Pell *v.* Newark was before the Court of Errors this particular question was reserved, as it was not necessarily involved.   On the present occasion this problem is directly before us for decision.

In my opinion, the solution of this question depends entirely on the settlement of the fact, whether these ward boundaries are in point of fact susceptible of modification by force of general legislation; for if they cannot be so altered, a special act for that purpose would not be objectionable.

The construction of the constitution from which this opinion proceeds is not with me a novelty.   When the constitutional clause now in question was first presented, in the case of *Parsons* v. *Van Riper*, 11 *Vroom* 1, to this court for exposition, I was led, after a careful examination of the subject, to the conviction, that it was only such internal affairs of municipalities as could be regulated by general legislation that were required so to be.   This was the language, in this respect, then used : " In laboring this point in their argument the counsel of the relators seem to incline to the conclusion that a special or local law could in no case be passed, the purpose of which was to regulate the internal affairs of any municipality. I cannot agree to this view.   According to my reading of the constitutional clause in question its purpose, was not to limit legislation, but to forbid only the doing by special and local laws those things that can be done by general laws."

And this exposition appears to be the only one that will harmonize with the language of the clause, or with any purpose that can be reasonably ascribed to the people in its enactment.   It does not seem credible that it was the popular intention to deprive the legislature of the power to alter or amend those parts of the structures or methods of the municipalities of the state that cannot be altered or amended by general laws.   This was the view on this subject expressed in the case from which a citation has already been made : " The intent here, I think, is perfectly plain, and it was to require, within this department, all things that could be effected by general statutes, to be effected in that way ; but

there is no intent to abrogate the legislative power outside of this field. The opposite interpretation would be full of impracticabilities not to say absurdities. By its prevalence the peculiar imperfections inherent in the frame of any existing public corporation would at once be made unalterable and irremediable. The boundary of every city, township and county would become insusceptible of change, and the constitution of such bodies, with respect to matters unique, and therefore not to be reached by general laws, would be beyond the hand of improvement or modification."

The view thus expressed it seems to me is fortified and confirmed by the context of the clause under discussion. The section is thus constructed: it first designates certain matters that are not to be effected by special laws, and then, towards its close, it declares that "the legislature shall pass general laws for the cases enumerated in this paragraph;" a form of expression that demonstratively implies that the things thus enumerated can be accomplished by general legislation. We cannot well suppose that the legislature is enjoined to do that which is impossible to be done.

That there are certain regulations of the internal affairs of cities, townships and counties that cannot be effected by general legislation, is self evident. It does not seem possible to establish any general plan or mode whereby the exterior lines of any of such political districts can be altered; and every such alteration must, in the nature of things, be a regulation of its internal affairs. In fact, every such modification must not only be a regulation of its internal affairs, but must be one touching vital interests, for it must either add to or detract from the voting population. When the municipalities of Chambersburg and Millham were recently incorporated with the city of Trenton, it does not appear to me that it can rationally be denied that the internal affairs of the latter city were regulated. By this consolidating act new wards were fashioned out of the territory that was added to the capital, and were adjusted so as to harmonize with its old wards.

This act was accomplished by a special statute, and according to my exposition of the constitutional clause in question as above explained, such a statute was plainly legitimate, for the reason that the consolidation of these three places could not be effected by any other means. No general law could have been devised adapted to the exigency, hence special legislation was properly resorted to; no other ground is perceived whereby the transaction is to be vindicated.

But while there are junctures in which special legislation can be thus exceptively resorted to, such junctures will be of unfrequent occurrence. Most things of this kind can be accomplished by general legislation, as, for example, legislative directions touching the streets of municipalities, their system of sewers, water, lights and matters of that kind. With regard to such urban instrumentalities there can be no difficulty; but, as we have seen, a different state of affairs will sometimes arise when it becomes expedient to modify a part of the organization of the government of the city, as, for example, in the instance already presented of a necessity to extend the municipal area. As we have seen, in the latter class of exigencies special legislation, from the necessity of the case, is allowable, while in the former classes, the necessity that would alone justify such restricted legislation being absent, the purposes in view can be executed by the use of a general law only.

The inquiry therefore presses, are the boundaries of municipal wards susceptible of alteration through a general law, and this, in my apprehension, is the only point of real difficulty in the present case.

That such a system, or rather aggregation of wards as are exhibited at present in the cities of this state, could not be fabricated by virtue of a general law, seems to be obvious. The ward divisions in each city, as they now exist, constitute a specialty; they are unlike those of every other city; and it is not too much to say that no two wards in the entire state can, in any material respects, be assimilated. It is impossible to conceive of such particularities being created or modified

except by a special act for the purpose. How can a general law be framed, that must possess in each city a different force from what it has in every other city? It is plain that such an end cannot be more lawfully reached by a delegation of the necessary power to each of these cities, for this would be virtually saying to each separate municipality, you may alter your organization in this respect to suit your own notions; and if such delegated authority, in this particular, were held legitimate, it would necessarily follow that a similar capacity could be conferred severally on these cities to modify at will other parts of its organization; the result being that instead of uniformity in the municipal governments of the state, as the constitution designs, we would have infinite multiplicity.

The result of this line of consideration is this: that if the wards of cities could be constituted no otherwise than as we now find them, and consequently could not be the creatures of general legislation, I should be constrained to hold that the legislature, by special law, could legitimately alter or readjust such political precincts at its will. As a general act effective of the purpose would be an impossibility, a special act would not be interdicted by the constitution. On this basis I should have held that the act now in question, and which modifies some of the wards of the city of Newark, to be unobjectionable.

But, upon mature reflection, I have come to the conclusion, that although it is an impossible thing either to create or to modify, by a general statute, the present distribution of the areas of the cities of the state into wards as they now exist, nevertheless, it is practicable, by general legislation, to establish in such cities a general system, and that, consequently, these municipal instrumentalities cannot be readjusted or affected in any other mode. For example, if a law should be enacted distributing the cities of the state into classes on the basis of population; declaring that each class should have a certain number of wards, and that such wards should be so set off so that each should contain, as nearly as practicable, the same number of voters, it is not perceived how such a scheme

could be reasonably objected to. A conviction that this, or some other plan of the kind, is feasible, of course inevitably leads to the conclusion that special legislation in this field is out of place, and that the act under consideration is void on the ground of its unconstitutionality.

This conclusion renders it unnecessary to consider the error that exists in the description of the boundary between the old Seventh and Fifth districts in the city of Newark in the Assembly District Reapportionment act, approved March 27th, 1889. If that description be exactly followed, a small parcel of territory is left out and is unembraced by any of the remodeled districts.

As I have examined this subject with some care, it may not be amiss to express my opinion on the subject, which is, that the small parcel of territory in question belongs and goes with that portion of old District No. 7 which is taken therefrom for the purpose of readjustment. The intention to embrace the entire territory of Newark in the new system, and the parcel of land in question being in express terms excluded from District No. 5, it becomes manifest that it was omitted from the portion of No. 7 above mentioned by pure error in running the boundary of that tract. Under such a condition of facts, the error comes within the curative effect of the rule *falsa demonstratio non nocet.*

DIXON and REED, JJ. So far as the opinion of the Chief Justice intimates that, in cases where the internal affairs of towns or counties cannot be regulated by general laws, they may be regulated by special or local laws, we are not prepared to concur therein. The point is not necessarily involved in the decision of the cause.