JACOB RUTTEN, PROSECUTOR, v. THE MAYOR AND AL-
DERMEN OF THE CITY OF PATERSON ET AL.

Argued June Term, 1906—Decided August 3, 1906.

1. *Pamph. L.* 1905, *p.* 131, provides that whenever, in any city of the second class, fifty per cent. or more of the board of aldermen or other governing body shall petition the mayor or chief executive officer of such city that a change of ward lines is necessary for the proper representation of the residents of the city, it shall be the duty of the chief executive to appoint three resident commissioners to resubdivide the city. *Held,* that the act requires that the application to the mayor for the appointment of commissioners shall proceed from fifty per cent. or more of the board of aldermen, common council or other governing body of the city, acting in their official capacity, and not as individual citizens, and that the petition shall evidence the prevailing sentiment of the governing body as a body, or at least an equal division of sentiment, after the governing body has, in its official capacity, deliberated upon the question, and hence the act is not unconstitutional as delegating legislative power to private citizens.

2. *Pamph. L.* 1905, *p.* 131, authorized the redistricting of cities of the second class on petition to the mayor by at least fifty per cent. of the board of aldermen, common council or other governing body. After the approval of the act, and on May 20th, 1905, the city of Paterson attempted to take advantage thereof, but its proceedings were irregular, whereupon *Pamph. L.* 1906, *p.* 89, was passed to "validate proceedings of commissioners previously appointed to divide cities into wards and to confirm their actions in relation to such division." This act provides that the acts of all commissioners previously appointed who have proceeded according to law to divide the city into wards, &c., shall be valid, although the action of the mayor was initiated on petition of fifty

per cent. or more of the members of the common council, &c., of any city. It was admitted that the city of Paterson was the only city in which such proceedings had been taken. *Held*, that the curative act is unconstitutional as a special and local law regulating the internal affairs of cities.

3. A decision, based on stipulated facts, declaring that a statute is unconstitutional does not wipe the act from the statute books, but merely denies its efficacy to a party who has admitted the existence of a state of facts which, in the opinion of the court, renders the law unconstitutional.

On *certiorari*.

The above-stated matter was heard before Justice Pitney, sitting alone for the Supreme Court, pursuant to the terms upon which the writ of *certiorari* was allowed.

For the prosecutor, *Michael Dunn* and *William B. Gourley*.

For the respondents, *Francis Scott, Eugene Emley, William I. Lewis* and *Edmund G. Staller*.

The following are the conclusions of

PITNEY, J. The writ of *certiorari* herein brings under review the action of William H. Belcher, formerly mayor of Paterson, in appointing commissioners to divide the city into wards, and the proceedings taken by the commissioners thus appointed, including the report made by them in writing, by which they assumed to make such a division.

At and before the proceedings now under review Paterson was a city of the second class, and consisted of eleven wards. Its governing body is a board of aldermen, composed of two members elected from each ward. *Winters* v. *Warmoltz*, 41 *Vroom* 615.

By "An act concerning the division of wards in cities of the second class in this state," approved March 30th, 1905 (*Pamph. L., p.* 131), which took effect immediately, the legislature enacted, in substance, as follows: That "whenever, in any city of the second class, fifty per centum or more of the board of aldermen, common council or other governing

body shall petition the mayor or chief executive officer of such city that in their opinion a change of the ward lines in said city is necessary for the proper representation of the residents of said city, it shall be the duty of the said mayor or chief executive officer of such city, within thirty days after receiving said petition, to appoint, by writing under his hand, three residents of such city commissioners, whose duty it shall be, within thirty days after their appointment, to divide the city in and for which they are appointed into wards (without increasing the number of wards) as herein provided." The commissioners so appointed, having first taken an oath of office, must proceed to divide such city into wards, to be formed of contiguous territory, having regard to equality of population; the boundary lines of the wards are to be properly described, and a map defining the lines is to be made and filed by the commissioners in the office of the city clerk or with the mayor, together with a description or statement of such lines; the acts of a majority of the commissioners to be taken to be the acts of all the said commissioners, and to be valid and binding when done in pursuance of this act.

After the approval of this act, and on or before May 20th, 1905 (the board of aldermen then consisting of twenty-two members), a petition in writing was presented to Mayor Belcher, signed by eleven persons who were members of the board of aldermen. This petition certified that in the opinion of the signers a change of the ward lines of the city was necessary for the proper representation of the residents of said city, and the subscribers petitioned the mayor for the appointment of commissioners to divide the city into wards. Thereupon, and on May 20th, 1905, the mayor appointed three residents of the city as commissioners for the purpose, who, having taken the oath of office, proceeded to make division of the city into nine wards. A certificate of their action, with a description of the ward lines and a map thereof, was attested by the commissioners under their hands and filed in the city clerk's office on June 14th.

The prosecutor, who is admitted to be a resident, taxpayer

and property owner of the city of Paterson, and therefore legitimately interested in the proceedings referred to, prays reversal of the appointment of commissioners, and of their report or certificate dividing the city into wards, on the ground that the act of March 30th, 1905, is unconstitutional, and on the further ground that if the act be constitutional. the proceedings that were taken were nevertheless illegal, because not in conformity with said act.

As a matter of fact, no action of any kind has been taken by the board of aldermen (which is the governing body of the city of Paterson) looking to the appointment of said commissioners by the mayor, or looking to the division of the city into wards, under the act of 1905. It is the insistment of the respondents that action by the board of aldermen, as a board in meeting assembled, is not necessary to set in motion the machinery of the act; and that, on the contrary, it rests with fifty per centum or more of the citizens who happen to constitute the board to determine whether the commissioners shall be appointed.

A glance at the statute shows that after presentation of the petition to the mayor he has no discretion about appointing commissioners, nor have the commissioners any discretion upon the question whether the city shall or shall not be divided into wards. The legislature has assumed to make the act to this extent mandatory, providing only that such a petition as it contemplates shall be presented to the mayor.

If the act were to be construed as meaning that this petition may proceed from certain individuals happening to constitute one-half or more of the membership of the board of aldermen—acting, however, in respect of the petition, not as members of the board, not as voicing the sentiment of the board in session, nor even as expressing the opinion of the signers formed after hearing the views of their brethren in the board—it would, I think, result that under the decisions in this state the statute must be declared void as amounting to an unconstitutional delegation of legislative power to private citizens. *Gilhooley* v. *Elizabeth, 37 Vroom* 484, 485.

There is no doubt that the determination of the question

whether the public interests require that a city be divided into wards is an act of legislation, and that what is contemplated in the present instance, to wit, a readjustment of the wards and ward lines in a city already divided into wards, is just as clearly a matter of legislation. *Dempsey* v. *Newark,* 24 *Vroom* 4; *In re Ridgefield Park,* 25 *Id.* 288. Especially is this manifest when the wards exist for the purpose of determining to some extent the representation of the citizens in the governing body of the city, a body that has powers of legislation for purposes of local government. Now, I do not doubt that the legislature may, by an act that is free from other constitutional objections, declare that cities already thus divided shall be again divided, and the existing ward lines readjusted. Nor do I doubt that the applicancy of such legislation to a given city may be made to depend upon facts to be ascertained and determined subsequent to its enactment, if such determination be for the purpose of manifesting the characteristics upon which the classification of cities depends, or for any other legislative purpose. But if the question whether such an act shall go into effect in a given city is made to depend upon the judgment, opinion or discretion of any man or set of men, this amounts to a delegation of the legislative power. That such power may be delegated by the general legislature to the inhabitants of a city, I make no question. *Paul* v. *Gloucester County,* 21 *Vroom* 585, 600. That it may be delegated to the governing body of the city chosen by its inhabitants for purposes of local legislation, I have no doubt. *Allison* v. *Corker,* 38 *Id.* 596, 603. And I am even inclined to think (although this is a novel point to me) that it is constitutional for the legislature to say that if the governing body of a city shall be equally divided upon the question whether the city ought or ought not to be divided into wards, then a statute shall go into effect providing for its redivision.

The act before me admits of the construction just suggested. Its phrase "fifty per centum or more of the board of aldermen, common council or other governing body" admits of the construction that the petition is intended to

voice the prevailing sentiment of the governing body as a body, or at least an equal division of sentiment in that body. This construction is rendered the more reasonable when we observe that the point upon which opinion is to be expressed is whether a change of the ward lines is necessary for the proper representation of the residents of the city. Unless this discretion is confided to the aldermen as a legislative discretion, there is no reason that I can perceive why the referendum should be.to members of the board of aldermen at all.

It is, of course, quite obvious that such a construction of the act ought to be adopted, if it be reasonably admissible, as will render the act constitutional, rather . than such a construction as would render it violative of the fundamental law.

That the act would violate the constitution if it did indeed confide to any eleven gentlemen who happened at the time to occupy a non-representative public station to decide amongst themselves whether the act should have effect in a given city, I deem to be settled by our decisions. It is not at all the same in substance and effect as delegating to a representative body the power to make a similar decision. Representative bodies chosen by the constituencies to act in the performance of a public duty in matters of local legislation, when they proceed under the sanction of official oath at meetings publicly attended and with due form and procedure, are presumed to represent the interests of those by whom they are chosen. No such presumption attaches to the acts of casual referees chosen by the legislature, and acting without responsibility to the people.

I construe this statute, therefore, as requiring that the petition to the mayor shall be the result of action by the board of aldermen in official meeting assembled, and as certifying to the mayor either that a majority of sentiment is in favor of redistricting or at least that the board is equally divided upon the question. The difference between a petition thus originating and the petition that is included in the return to the present *certiorari* is manifest. What the eleven signers of the present petition might be willing to certify as

individuals and after exchanging views between themselves, is by no means presumably the same that they would certify after hearing the views of their fellow-members in the board of aldermen, after discussion had and action taken in the board upon the question.

Since it is clear from the admitted statement of facts that the petition now under consideration did not evidence the official determination of the board of aldermen, nor the determination of the signers made upon their responsibility as members of the board after consideration of the subject in a board meeting, it did not, in my view, justify the appointment of commissioners made by the mayor thereunder. Since it is admitted that no action of any kind has been taken by the board of aldermen upon the question, the defect in the petition is not formal, but substantial, and the proceedings under review must be set aside.

Under the circumstances, the order of reversal will be made without costs to either party as against the other.

Upon reargument before Justice Pitney, sitting alone for the Supreme Court.

PITNEY, J. My former conclusions herein were promulgated shortly after the approval of the validating act of March 30th, 1906 (*Pamph. L., p.* 89), but this act had not been called to my attention and I was unaware of its existence. Upon being informed of it I at once ordered a reargument, and this has accordingly been had. Its scope included the matters covered by the former argument, as well as questions raised by the new act.

Upon reconsideration, I adhere to the conclusions formerly announced concerning the true intent and meaning of the act of 1905 (*Pamph. L., p.* 131), and remain of the opinion that it contemplated that the application to the mayor for appointment of commissioners to redistrict the city should proceed from "fifty per centum or more of the board of aldermen, common council or other governing body," acting not upon their individual initiative as citizens, but in their responsible capacity as members of the board, the intent being

that their petition should evidence the prevailing sentiment
of the governing body as a body, or at least an equal division
of sentiment in that body, after the governing body had in its
official capacity deliberated upon the question. I still think,
also, that the petition upon which the mayor in this instance
appointed commissioners did not conform to the require-
ments of the act of 1905 because, under the admitted state-
ment of facts upon which the cause was heard, the question
of redistricting had not been considered in the board of
aldermen. Peradventure, if it had been publicly debated in
the board, some of the members who signed the petition would
have been convinced that the question of redistricting ought
to receive a negative answer.

It remains, therefore, only to consider the act of 1906.
*Pamph. L., p.* 89. Its title is, "An act to validate the pro-
ceedings of commissioners heretofore appointed to divide
cities into wards, and to confirm their actions in relation to
such division." It enacts that "the acts of all commissioners
heretofore appointed to divide cities into wards, where such
appointments were made by the mayor of any city, and said
commissioners have proceeded according to law to divide the
city into wards and file their report or reports, are hereby
confirmed and validated and made legally binding, although
the action of such mayor was initiated upon petition or
otherwise of the common council, board of aldermen or other
governing body, or upon petition or otherwise of fifty per
centum or more of the members of the common council, board
of aldermen or other governing body of any such city."

Adopting (in favor of respondents) such an interpretation
of this language as to make it evince a legislative purpose to
validate proceedings that derived their efficacy from a petition
of citizens who, although members of the governing body,
acted in such petition as individuals and not as members
of the board—so as to make the act apply to the proceedings
under review—the question of the constitutionality of the
legislation remains for decision.

Although several constitutional questions have been raised,
I have found it necessary to consider only whether the act is

a special and local act regulating the internal affairs of cities.

That it "regulates the internal affairs" within the constitutional meaning is, I think, too plain for argument.

Is the act special and local? It is general in form, except that, being a validating act, it applies only to cities where defective proceedings of the sort referred to have occurred previous to its passage, applying no similar rule to the like defects thereafter occurring.

By stipulation of the parties it is made to appear that Paterson is the only city where proceedings were taken for division of wards in cities of the second class in virtue of the act of 1905, and that at the time of the approval of the act of 1906 Paterson was the only city where commissioners had been theretofore appointed by the mayor to divide the city into wards. Conceding the propriety of hesitating before deciding an act of the legislature to be unconstitutional upon a stipulation of parties, it must, at the same time, be remarked that in this litigation, as in all litigations, the interests of the parties are subject to the management and control of their attorneys and counsel respecting the production of evidence. This stipulation relates solely to matters of fact, and it is proper—and, indeed, necessary—for the court in each case to find the law that shall bind the parties litigant as applied to such facts as they produce in evidence. A decision based upon stipulated facts that results in declaring a law unconstitutional does not wipe the act from the statute books, but merely denies its efficacy to a party who has admitted the existence of a state of facts that in the opinion of the court renders the law unconstitutional.

Again, even without the stipulation, it would seem almost of necessity to result that Paterson, if not the only city, is one of a very small group of cities to be affected by the validating act. There is, as I understand it, no other legislation except the act of 1905 whereby the mayor of a city could appoint commissioners to divide the city into wards upon petition of the governing body or upon petition of fifty per centum or more of the members of the governing body;

therefore the validating act has reference solely to proceedings taken, or assumed to be taken, under the act of 1905. Being a validating act, its only operation is to confirm defective proceedings. That defective proceedings were taken in Paterson has already been adjudged. It is not to be presumed that defective proceedings were taken in other cities under the act of 1905 within the brief space of one year that elapsed before the passage of the validating act. All acts of an official nature are presumed to be rightly done until the contrary is proved. *Broom Legal Max.* *729.

The act of 1905, of itself, applied only to cities of the second class, viz., those having not less than twelve thousand nor more than one hundred and fifty thousand inhabitants. This group, according to the last census, comprises but thirteen municipalities, viz., Paterson, Camden, Trenton, Hoboken, Elizabeth, Bayonne, Passaic, Orange, East Orange, New Brunswick, Perth Amboy, Plainfield and Bridgeton. It is not to be presumed, without proof, that any one of these proceeded under the act of 1905, much less that any one of those assuming to proceed thereunder did so upon proceedings that were not lawfully initiated. For it will be observed that the validating act assumes to confirm, not so much defective proceedings as proceedings that were initiated in a certain manner. The act mentions proceedings initiated in two manners, one of which is plainly proper under the act of 1905, and the other (as I hold) as plainly improper. It is the latter defect only which is validated, and the presumption against this particular form of defect having occurred in any one of the thirteen cities, except in Paterson, where it is proved to have occurred, is to my mind very great. The validating act contains no preamble reciting facts showing its applicancy to other cities.

It is therefore but reasonable to consider the act of 1906 as applying to Paterson alone, as counsel admits to be the case.

This being so, it seems to me to necessarily result that the act is a special and local law within the constitutional interdict.

I do not at all question the constitutional power of the legislature to pass validating acts in this class of cases. I have no doubt they might validate anything that they might authorize, and have no doubt of their power to oblige the mayor to appoint commissioners for the purpose of dividing the city into wards, even without any petition. But the legislative power to validate defective proceedings does not extend to authorize them to employ a validating act as a means of regulating the internal affairs of cities, if such act be special and local.

The generality of the phraseology of the act of 1906 being limited, as already shown, by the facts actually existent, the statute (upon the interpretation adopted) is in effect the same as if it declared that the proceedings heretofore taken in Paterson under the act of 1905 for dividing the city into wards should be confirmed and made legally binding, although the action of the mayor was initiated upon petition of fifty per centum of the individuals being members of the board of aldermen. That such an act as this would be unconstitutional, because special, seems to me to admit of no debate.

I cannot agree that such a method of selecting the objects for municipal legislation is at all recognized by the decision of the Court of Errors and Appeals in the *Cleveland Case,* 23 *Vroom* 188, or in any other decision to which my attention is called. The Cleveland case sanctioned a referendum law that offered the referendum to a class of cities, notwithstanding that but one of the class might adopt it. There the choice was open to all, and singularity resulted only from the exercise of the choice. The act of 1906 under consideration is not at all of a similar character.

Nor is this act within the rule adopted by the Court of Errors and Appeals in *Cooper* v. *Springer,* 36 *Vroom* 594, 597. There the court had to deal with an act (*Pamph. L.* 1899, *p.* 534) conferring certain municipal powers in places theretofore organized as boroughs under unconstitutional laws. It was upheld as constitutional, Justice Van Syckel saying (at *p.* 597): "In reaching this conclusion the fact has not been overlooked that the act applies only to the then

existing boroughs of the class to which it relates. The case of *Bennett* v. *Trenton, 26 Vroom* 72, and the several cases therein referred to [he might have mentioned, also, *De Hart* v. *Atlantic City,* 34 *Id.* 223] are instances where the class would in the future, in the ordinary and regular course of events, be increased and added to. This case is not within the reason of the rule which condemned the legislation in those cases. The courts cannot, with proper respect for a co-ordinate branch of the state government, pronounce a statute infirm on the presumption that the legislature may, in the future, pass unconstitutional laws."

Here, it will be observed, the court was dealing with the rule of Bennett *v.* Trenton and De Hart *v.* Atlantic City—the rule that municipalities afterwards "growing into the class" must be brought under the operation of the law in question in order to render such law general. And the court denied the application of that rule to the act of 1899 that was under review, on the ground that the basis of this classification was the existence *de facto* of boroughs that had been organized under laws declared unconstitutional. The court held that there was no reasonable expectation that this class of boroughs would be added to, because the borough acts in question had already been declared unconstitutional, and there was no probability of other boroughs being organized thereunder, nor any legal probability that the legislature would in the future pass other unconstitutional laws.

In other words, the decision in Cooper *v.* Springer simply denies the application of the rule of Bennett *v.* Trenton and De Hart *v.* Atlantic City to a certain class of cases. But this rule itself has no force—indeed, no reason for existence—except as a limitation rendering special a classification that otherwise would be general.

In the present case we have an act that is not only limited to municipalities where certain things have occurred in the past, but is further limited so as to apply to but a single city, that being the only city where such things have occurred in the past. It is the latter limitation that seems to me to render the act special, rather than the former, and the latter

limitation is not at all affected by the decision in Cooper *v.* Springer.

It results that upon the state of facts exhibited by the respondents the act of 1906 is unconstitutional, and the respondents cannot invoke it in aid of the defective proceedings theretofore taken under the act of 1905.

Those proceedings will therefore be set aside.