THE STATE, EX REL. HENRY J. BENNETT, RELATOR, v. THE COMMON COUNCIL OF THE CITY OF TRENTON.

1. Classification of municipal bodies upon the basis of their population at a given time, cannot be used as a means of designating particular cities to the exclusion of others that may acquire the same characteristics.

2. An "act concerning the construction of the common council, board of aldermen or other governing body of all cities of the second class of this state" (*Pamph. L.* 1892, *p.* 26), provides that in all cities of the second class in this state in which there now are by law three members of common council, board of aldermen or other governing body in and for each of the wards of such cities, hereafter the common council, board of aldermen or other governing body of all such cities shall consist of two members in and for each of the wards of such cities. By the state of facts agreed upon it appears that the city of Elizabeth, while within this classification in point of population, has but one councilman for each ward, and hence is not within the classification based upon existing councilmanic representation. *Held,* that population is the substantial basis of this classification: that the previous councilmanic representation is insignificant; that its employment did not tend to produce generality of application or uniformity of result, and that the enactment is set aside as being special and unconstitutional.

---

On application for *mandamus.*

The legislature of the State of New Jersey enacted the following law, which was approved February 18th, 1892:

"1. BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey,* That in all cities of the second class in this state in which there now are by law three members of common council, board of aldermen or other govern-

ing body in and for each of the wards of such cities, hereafter the common council, board of aldermen or other governing body of all such cities shall consist of two members in and for each of the wards of such cities, and each of the wards of such cities shall, at the annual city election of such cities as hereinafter provided in this act, elect one person as a member of the common council, board of aldermen or other governing body of such cities, who shall hold such office for a term of two years; *provided, however,* that the members of the present common council, board of aldermen or other governing body of all such cities shall be and continue as members thereof for the term for which they were severally elected.

" 2. *And be it enacted,* That in every city of the second class in this state where there now are by law three members of the common council, board of aldermen or other governing body in and for each of the wards of any such city, elected for the term of three years each, upon the expiration of the term of office of every member of the common council, board of aldermen or other governing body in every such city, which occurs next after the passage of this act, the office as well as the term of office of every such retiring member shall cease, determine and end, and then and from thenceforth the common council, board of aldermen or other governing body of every such city of the second class in this state shall consist of two members from each of the wards of such cities.

" 3. *And be it enacted,* That in all cities of the second class in this state where the office as well as the term of office of certain members of the common council, board of aldermen or other governing body of such cities shall cease, determine and end during the year one thousand eight hundred and ninety-two, according to the provisions of the last preceding section of this act, there shall not be any election held in any of the wards of such cities for members of the common council, board of aldermen or other governing body of such cities until the city elections in such cities, which shall occur in the year one thousand eight hundred and ninety-three, at which last-mentioned and all succeeding annual city elections in such

cities, there shall be elected in each of the wards of such cities one person as a member of the common council, board of aldermen or other governing body of such cities, who shall hold such office for the term of two years.

"4. *And be it enacted*, That all acts and parts of acts, general, special, public or local, inconsistent with the provisions of this act, be and the same are hereby repealed.

"5. *And be it enacted*, That this act shall take effect immediately.

"Approved February 18, 1892."

Notwithstanding the prohibition contained in the third section of this act, one of the political parties placed the relator in nomination for city councilman, to be voted for at the annual charter election of the city of Trenton, held on the 12th day of April, 1892. The canvass of the official ballots cast at said election showed that the relator to be elected to the office of city councilman, if any election to that office might lawfully be held in view of the provisions of the statute above cited. A *mandamus* is asked for to compel city council to admit the relator to membership.

Argued at June Term, 1892, before Justices VAN SYCKEL, MAGIE and GARRISON.

For the relator, *John Rellstab* and *John R. Emery.*

For the defendant, *Edwin Robert Walker* and *Garret D. W. Vroom.*

The opinion of the court was delivered by

GARRISON, J. The contest in this case is not over the right to the possession of an office, it is over the existence of the office itself. No one claims the office as against the relator. The contention here is that no person could lawfully be elected to said office, and that, therefore, the relator is not entitled to enter. The case is, therefore, not one for *quo warranto*, but for *mandamus*. *Leeds* v. *Atlantic City*, 23 *Vroom* 332.

The legality of the relator's election turns upon the constitutionality of the statute above recited. If that act is a piece of constitutional legislation, there existed no office such as that to which the relator claims admittance. The act in question is said to be unconstitutional because it is a special act regulating the internal affairs of cities. That it is regulative of the internal affairs of cities is indisputable. The only question is, whether the act is likewise special. The class or group of objects to which alone this legislation is made applicable, is cities of the second class in which there are three members of the city council from each ward. If the purpose of the act had been expressed in the mode in which I have just given it, the question of the substantiality of the classification adopted would be, as counsel evidently deemed it, the chief point of discussion. But the legislative object, as expressed in this act, does not embrace the whole of the class to which, if its classification be substantial, its provisions must extend. It does not purport to lay down a rule of conduct appropriate to cities of a certain population having a certain number of councilmen from each ward, but only for such cities as possessed these characteristics at the time of the passage of this act, to wit, upon February 18th, 1892. That is to say, " cities of the second class in this state in which there now are by law three members of common council," &c., " in and for each ward of such city." That classifications of municipal bodies on the basis of population cannot be used as a means of designating particular cities to the exclusion of others that may acquire the same characteristics, is now the established doctrine of this court. *Richards* v. *Hammer*, 13 *Vroom* 435, directly rules the present case. The classification there considered was "Any city of this state where a board of assessment and revision of taxes now exists." Chief Justice Beasley, in commenting upon the delimiting effect of the word " now," says : " The result is that the act was intended to apply, and that it does and must forever apply, to two cities alone," concluding that a law thus designed and framed cannot stand the constitutional test.

In *Coutieri* v. *New Brunswick*, 15 *Vroom* 58, and *Pavonia Horse R. R. Co.* v. *Jersey City*, 16 *Id.* 297, classifications on the basis of population, according to a certain census, were condemned upon the express ground that the fact that the characteristics selected for legislation were possessed by some cities at a certain period of time, did not justify legislation for them alone as a class.

In *Pierson* v. *O'Connor*, 25 *Vroom* 36, an act applicable to a certain class, to wit, "honorably discharged soldiers now in office," was declared special, Mr. Justice Knapp saying that such a law "is hopelessly void because only those members of the designated body of men who held office at the time of the passage of the act are given the benefit of its provisions."

In *Stahl* v. *Trenton*, 25 *Vroom* 444, an act requiring the publication of ordinances in all cities in which a newspaper printed in the German language shall have been published at least once a week for a period of not less than three years prior to the passage of the act, fell under similar condemnation, Mr. Justice Dixon saying : "There seems to be no substantial reason why cities which, on April 11th, 1889, had German newspapers of three years' standing should be compelled to publish their municipal proceedings in such a paper while those cities which might thereafter have newspapers of the same sort should not be required to do so."

The propriety and practical application of the doctrine thus illustrated is well shown by the state of facts agreed upon in the present case, by which it appears that the law as framed in February, 1892, applied to the city of Passaic with thirteen thousand and twenty-eight population, and not to Bridgeton with eleven thousand four hundred and twenty-four, although the latter city possessed in other respects precisely similar characteristics, and is probably, by this time, to all intents and purposes, a city of the second class, as well as by virtue of the act of 1891 (*Pamph. L.*, *p.* 306), if that act be capable of intelligent interpretation, but Bridgeton can never come within the act under review, because it was not, upon the day

fixed by this act, a city of the second class having the requisite characteristics.

There is another ground upon which this enactment is unconstitutional even if it had been framed so as to apply to all cities of the second class that now have or that hereafter might have three members of common council from each ward. In this aspect the distinguishing feature selected as the basis of classification would be the having of three councilmen from each ward, and the legislative purpose would be the establishment of two councilmen as the proper number in such cities. But such a classification with respect to the proposed change would evidently be lacking both in generality of application and in uniformity of result. For even assuming that "three" means "three or more," it would still leave Elizabeth with but one councilman for each ward, hence the whole of the class as based upon population would not be within the operation of the act, but only such as had three or more councilmen from each ward. Such an enactment, reference being had to its object, is not general, for the reason that the remedy proposed springs out of the exigencies of population or the necessity of uniformity not out of the previously existing basis of councilmanic representation. The mandate of the constitution is not only that special laws shall not be passed for certain objects, but also that the cases enumerated shall be provided for by general laws, *i. e.,* laws that shall embrace all and exclude none whose conditions and wants render such legislation equally necessary and appropriate to them as a class. *Randolph* v. *Wood,* 20 *Vroom* 85. A law establishing two councilmen from each ward in cities having a population of between twelve thousand and one hundred thousand (and that is all the term "cities of the second class" stands for), is not a general law if, after its passage, it leaves any city of that class with more or less than the prescribed representation.

Our conclusion is, that the act in question is clearly unconstitutional; that the office of councilman to which the relator was elected was and is an existing office, and that the *mandamus* prayed for should go, with costs.