ANDREW ALBRIGHT, PROSECUTOR, v. THE SUSSEX COUNTY LAKE AND PARK COMMISSION ET AL.

Argued February 19, 1902—Decided November 10, 1902.

1. The act approved March 22d, 1901, entitled "An act to acquire rights of fishing common to all in fresh-water lakes in certain counties, to acquire lands adjoining thereto for public use and enjoyment therewith, and to regulate the same" (*Pamph. L., p.* 333), is constitutional.

2.  The act in question (*Pamph. L.* 1901, *p.* 333) has but one object, which is to establish places of public resort upon the fresh-water lakes, with public rights of fishery as the prominent and attractive feature. This object is sufficiently expressed in the title, as required by the constitution. *Art. IV.*, § 7, *pl.* 4.

3.  The act in question (*Pamph. L.* 1901, *p.* 333) is a general law, and not local or special, within the prohibition of the constitution. *Art. IV.*, § 7, *pl.* 11.

4.  Subject to a referendum, the act provides for establishing, in every county of the state that has fresh-water lakes exceeding one hundred acres in area, a system of free public fisheries in the fresh-water lakes having the area mentioned. *Held*, that the resulting classification has direct and natural reference to the purpose that gives rise to the legislation, and is valid under the constitution.

5.  It was competent for the legislature, in authorizing the establishment of public fisheries in fresh-water lakes, to distinguish between the larger and the smaller sheets of water, and to draw the line of distinction according to a specified area of water surface. The act in question (*Pamph. L.* 1901, *p.* 333) applies this distinction, not for the purpose of classifying counties, but only for the purpose of classifying lakes. This is permissible.

6.  Where a number of counties possess the requisite features to bring them within a classification valid under the constitution, discriminations resulting from the effect and operation of a referendum do not make the classification special.

7.  The referendum clause contained in section 18 of the act in question (*Pamph. L.* 1901, *p.* 333) is substantially as follows : "That none of the foregoing provisions shall take effect in any county, nor shall the commissioners be appointed in any county, until the acceptance or rejection of this act shall have been submitted as herein provided to a popular vote ; such submission shall be made at the next election, whether general, municipal or special, wherein the people of the county are authorized to vote for local officers, and it shall be the duty of the county clerk to give public notice of the election, provide and distribute ballots, &c., and the duty of the election officers to hold the election and ascertain and certify the result ; the acceptance or rejection of this act shall be determined by the result of such election ; and if there be a majority of ballots in favor of this act, then this act, but not otherwise, shall take effect in such county." Section 19 provides that the act shall take effect immediately as regards the submission thereof to a popular vote. *Held*—

    (*a*) That with respect to imposing a duty upon the county clerk and election officers to prepare for and hold an election, the effect of the act is immediate and imperative, and the duty continues until it is performed.

    (*b*) For other purposes the act does not take effect in any county until the question of its acceptance or rejection shall have been submitted to the people in the manner contemplated by the act.

    (*c*) It is not essential that the question shall have been submitted

at the election held next after the passage of the act. The referendum clause is mandatory in the requirement that the act shall be submitted to the people substantially in the method prescribed ; it is directory with respect to the time of such submission.

(*d*) The neglect or failure of the county clerk and election officers to perform their duties in such manner as to test the sense of the people at the precise time contemplated by the legislature, cannot defeat the will of the legislature or deprive the people of the option of acceptance granted by the act.

(*e*) In counties having the necessary features to bring them within the class, where, by reason of the failure of the public officials to perform their duty, or for other reasons, the people have not yet voted upon the question of accepting the act, it is still in order to submit the question of acceptance or rejection to the people, and a *mandamus* would lie to require the proper officials to advertise, prepare for and conduct the election.

8. It must be very plain language that would justify the courts in so construing a referendum clause as to put it within the power of a ministerial officer to nullify the act ; especially where the same construction must lead to the conclusion that the referendum is illusive, and the entire act for that reason unconstitutional.

9. The right of fishing in the fresh-water lakes of this state is, *prima facie*, in the owners of the soil covered by the water, and while so owned is private property ; but it is quite within the competency of the legislature to authorize the taking of that private property for the public use. In this respect the right of fishing stands on the same basis with other private property, and is subject to the eminent domain.

10. Under the act in question (*Pamph. L.* 1901, *p.* 333) the rights of fishery, when acquired by the public trustees designated by the act, will be open to the use of all citizens, subject only to reasonable regulations, to be prescribed by the trustees, and to the general laws of the state for the protection of fish. This constitutes a public use.

11. The establishment of a public park, with public rights of fishery as an appurtenance or incident, is a purpose that justifies the exercise of the power of eminent domain.

12. As the constitution (*Art. I., pl.* 16) authorizes private property to be taken for public use, the authorization includes the taking of any interest in such property less than the whole. It includes the taking of a right of *profit a prendre* in lands.

13. The act in question (*Pamph. L.* 1901, *p.* 333), by its referendum clause, requires that the question of acceptance be submitted at an election participated in by the voters of the entire county.

On *certiorari.*

Before Justices FORT, HENDRICKSON and PITNEY.

For the prosecutor, *Thompson & Hall* and *Charles L. Corbin*.

For the defendants, *John W. Griggs*.

The opinion of the court was delivered by

PITNEY, J. This *certiorari* brings before us for review an order bearing date November 20th, 1901, made by Mr. Justice Garretson, appointing certain citizens of Sussex county as members of a board of commissioners to be known as the "Sussex County Lake and Park Commission." This order was made under the authority of an act of the legislature approved March 22d, 1901, entitled "An act to acquire rights of fishing common to all in fresh-water lakes in certain counties, to acquire lands adjoining thereto for public use and enjoyment therewith, and to regulate the same." *Pamph. L., p.* 333. It appears that the question of the acceptance or rejection of this act was submitted to a popular vote in the county of Sussex at an election held on the first Tuesday of November, 1901, at which five thousand and eighty-eight votes were cast. Of these, three thousand and thirty-six were in favor of the acceptance of the act, one thousand nine hundred and twenty-four were opposed, and one hundred and twenty-eight ballots were rejected. The result of the election having been ascertained and determined in the manner prescribed by section 18 of the act, and having been certified to Mr. Justice Garretson, the order appointing commissioners was thereupon made pursuant to the act.

The reasons assigned by the prosecutor for setting aside the appointment of commissioners may be reduced to two, viz., *first,* that the statute in question is unconstitutional; and *secondly,* that the acceptance or rejection of the act was not submitted to popular vote at the next election wherein the people of the county were authorized to vote for local officers, as provided by section 18.

The unconstitutionality of this statute is urged upon several grounds.

*First.* It is insisted that the object of the act is not sufficiently expressed in its title. The argument is that the title specifies three objects, viz., (*a*) to acquire rights of fishing common to all in fresh-water lakes in certain counties; (*b*) to acquire lands adjoining thereto for public use and enjoyment therewith; (*c*) and to regulate the same. It is insisted that the act embraces the following additional objects, viz., (*d*) to create a corporation to be known as the ———— county lake and park commission; (*e*) to authorize the corporation to acquire fishing rights and lands; (*f*) to authorize the corporation to lay out, improve and regulate roadways leading from such lands to the nearest highway; (*g*) to condemn lands for such roadways and assess the benefits upon the lands benefited; (*h*) to require the board of freeholders to issue bonds to provide for the expenses incurred under the act; (*j*) to authorize the construction of steam and other railroads over the lands or roadways.

A careful examination of the act, however, will show that it has but one principal object, which is to establish places of public resort upon the fresh-water lakes, with public rights of fishery as the prominent and attractive feature. The phrase contained in the title, viz., "to acquire rights of fishing common to all in fresh-water lakes," is somewhat elliptical, but its meaning is entirely plain. The word "acquire" is used in a broad sense, involving the permanent vesting in trustees for the public benefit of common rights of fishing in fresh-water lakes, meaning, not such rights as are already common to all, but such rights as shall be, after acquisition, common to all. In view of the established rule of property in this state, that the soil under the waters of fresh-water lakes and the right of taking fish therefrom are private property (*Cobb* v. *Davenport,* 3 *Vroom* 369; *Albright* v. *Cortright,* 35 *Id.* 330), the first clause of the title is not only free from any ambiguity, but expresses, perhaps, in as brief a phrase as possible, the main object of the legislation, which is to acquire this private property and devote it to public use.

The other purposes mentioned in the title, as well as those embraced within the act, but not mentioned in the title, are

all incidental to the principal object. If the principal object is supportable under the constitution, the others are supported at the same time, for, in the judgment of the legislature, they were necessary to enable the public to enjoy the common fishing rights, and there is nothing from which this court can say that they are not reasonably necessary for such enjoyment. Granting the propriety of establishing a common fishery in fresh-water lakes, it is, of course, necessary to acquire lands adjacent to the lake in order that the public may enjoy the fishery. The creation of a corporation authorized to acquire the fishing rights and the lands, and to maintain the rights and lay out and improve the lands, is simply the machinery by which the public trust is to be preserved and executed.

The power to lay out roads leading from such lands to the nearest public highway is obviously necessary. The power to condemn lands for the roadways is equally so. The authorization that the benefits may be assessed upon the lands peculiarly benefited is a matter within the legislative discretion, and is disposed of according to a method frequently adopted. And if no lands are specially benefited, none will be assessed. If there were doubt of the constitutionality of the assessment for benefits, it might be eliminated from the act without impairing the remaining provisions. The bonding provisions are plainly incidental to the main object.

There is nothing in the act empowering the commissioners to construct steam railroads or other railroads. The objection refers to section 16, which provides that no steam or other railroad shall be laid out, maintained or operated upon any portion of the lakes, lands or roadways laid out and located under this act, except at such places and in such manner as the board of commissioners shall, in writing, duly approve. This is prohibition, not authorization.

Nor does the inclusion of roads and parks in a single act make the statute void, as embracing more than a single object.

In *Rader* v. *Township of Union*, 10 *Vroom* 514, the late Chief Justice Beasley said: "The making and control of streets is a thing entirely different from the making of parks;

the two have no connection, and neither is an adjunct to the other, and it is impossible, as it seems to me, to logically hold that a description of one embraces both." In that case the question was, whether an act which, by its title, related only to streets could constitutionally embrace provisions for the laying out, opening and improving of public parks. The language quoted was pertinent to this inquiry, but it has no bearing upon a statute such as the one now before us. In the Rader case the parks were not needed for the enjoyment of the streets, and a complete system of streets would have been quite feasible without the laying out of a single park. But in the statute now before us the establishment of fishing parks is the principal object, and the streets are authorized, not for the purpose of laying out a system of highways, but only for the purpose of giving access to the parks. The two purposes thus have an intimate connection.

The second constitutional objection is that the statute is a local or special law, regulating the internal affairs of the counties to which it applies. As the act places the burden of expense upon the county, by providing that the expenditures shall be met out of the proceeds of county bonds, it must be treated as an act regulating the internal affairs of counties, under the decision of the Court of Errors and Appeals in *Freeholders of Passaic* v. *Stevenson,* 17 *Vroom* 173. The argument that it is local and special is based, in part, upon the fact that the act has applicancy only to counties having fresh-water lakes, in area exceeding one hundred acres, and, in part, upon the contention that its operation is limited to such counties as shall adopt the same at the next election, whether general, municipal or special, wherein the people of the county, qualified to vote, are authorized to vote for local officers; the insistment being that the time within which it might be adopted expired with the election held next after its passage.

The limitation to counties having fresh-water lakes of the requisite area results in a classification that has direct and natural reference to the very feature which gives rise to the

legislation. It is the existence of fresh-water lakes having considerable area, and for that reason adapted to the propagation of fish, and to the enjoyment of the fishing privilege by the use of boats or otherwise, which, in the judgment of the legislature, makes it feasible and proper to adopt, in certain counties, a system of fishing parks. It was for the legislature, in its wisdom, to draw the line between the smaller and the larger sheets of water, and we cannot say that an area of one hundred acres results in an unreasonable or illusive classification. By the terms of the act the smaller lakes are excluded from the scheme, even in those counties that adopt the act. In short, the distinction is applied, not for the purpose of classifying counties, but only for the purpose of classifying lakes. To this there exists no constitutional objection.

The proviso in section 2, "that this act shall not apply to any fresh-water lake which is now used as a source of water-supply for any city," &c., has the effect of limiting the class of lakes that are subject to the operation of the act, but not of limiting the class of counties that are subject thereto. The purpose is to prevent a body of water that is already impressed with one public use from being subjected, by virtue of this act, to another public use inconsistent with the first; a perfectly reasonable restriction upon the operation of the act, not rendering the legislation special. The same may be said of the restriction contained in the same section, that the act shall not apply to any lake not being wholly within the bounds of a single county; the obvious purpose of which is to prevent the people of one county from being taxed for a public work that would enure equally to the benefit of the citizens of another county. These restrictions are analogous to that which excludes from the operation of the act those bodies of water having an area of less than one hundred acres; are plainly matters that lie within the legislative discretion, and do not result in a classification of counties.

The case shows that nine of the twenty-one counties of the state have lakes and ponds over one hundred acres in size. Sussex county is one of the nine. It does not appear how many of these counties, other than Sussex, have voted either

to accept or reject the statute. For all that appears before us, each one of the nine counties may have voted upon it. But if it be assumed that no county, except Sussex, has voted upon the question, this cannot affect the question of constitutionality. If the legislation is such as to fairly give the opportunity to accept to each county having the requisite topographical features, the act is, in this respect, general. If one of these counties accepts it, the right of that county to enjoy the benefits of the act cannot be defeated by the rejection of the proposition in other counties, or by the failure of other counties to act upon the question. It is settled by the decision of our court of last resort that the discriminations necessarily resulting from the effect and operation of the referendum itself do not make the classification special. *In re Cleveland,* 23 *Vroom* 188.

But it is objected that the effect of the provisions contained in section 18 of the act is to confine the operation of the act to those counties only which shall accept it within a limited time. Upon this point the decision of the Court of Errors and Appeals in *De Hart* v. *Atlantic City,* 34 *Vroom* 223, is cited. The statute in question in that case (*Pamph. L.* 1898, *p.* 15) provided for the creation of a District Court in every city having twenty thousand inhabitants or less, which should, by resolution of city council, adopt the act within three months from the date of its passage, and it was held that this created an unconstitutional classification. See, also, *Christie* v. *Bayonne,* 35 *Vroom* 191; *Ross* v. *City of Passaic, Id.* 488, and *Renner* v. *Holmes, ante p.* 192, recently decided in this court. But there are important distinctions between those cases and the one now before us. In the De Hart, Ross and Renner cases the statutes in question, while in other respects applicable to a designated class of municipalities, were made special by the requirement that within a limited time after the passage of the act a local municipal board, not chosen by the people for the purpose, should take affirmative action upon the proposition. And in the case of other statutes that have come under the ban of the courts the legislature has assumed to classify municipalities with

respect to population, but has either in terms or by the operation of a referendum, limited in time, restricted the class to those municipalities possessing, at the time of the enactment, the requisite population, ignoring the growth of municipalities in the future. *Bennett* v. *Trenton*, 26 *Vroom* 72. Inasmuch as most, if not all, of our towns and cities normally increase in population from year to year, it is constantly to be held in view in classifying municipalities with respect to population, that in order to insure uniformity, provision must be made for those that shall hereafter attain the requisite number of inhabitants, as well as for those already possessing it.

But the present statute deals with a distinctive topographical feature that is in its nature fixed and not variable. There is no normal change necessarily to be anticipated in the future with respect to the possession by the several counties of the distinctive feature, which the courts can say must be within the contemplation of the legislature, so that a classification not taking it into account would for that reason be special. If, therefore, the present act did require that the submission to the people should be at the next election after the passage of the act, and could not be at any later election, we are not prepared to say that the act for this reason would be unconstitutional. Would it be beyond the competency of the legislature to say, "We will now create a class of counties for the purpose of this experiment in public and common fresh-water fisheries, and will embrace in the class those counties, now having the requisite topographical features, which promptly and on reasonable opportunity embrace the provisions of the act, leaving out all other counties?"

But if any constitutional consideration requires that the act should make provision for counties not now possessing, but which may hereafter come to possess fresh-water lakes, having an area exceeding one hundred acres, the statute is quite · susceptible of a construction that will admit such counties to its benefits. In view of the mandatory provisions of the first and succeeding sections of the act requiring the creation of this public agency for the purposes mentioned,

in every county having fresh-water lakes of the requisite size, the supposed limitation being found in section 18, it is significant that there is nothing either in section 18 or elsewhere in the act which, in terms, or by necessary construction, limits its operation to those counties now possessing lakes. Section 18 prescribes that the submission of the act to popular vote shall be done at the "next" election. If the legislature had intended by this to mean that it must be done at the next election held after the passage of the act, it would have been quite easy to say so. Indeed, had such an intent existed, it was comparatively easy to specify a date for a special election to be held in all counties, or to designate a general election that would be common to all counties. Therefore, in support of the constitutionality of the act, it is quite within the bounds of fair construction to take the words "next election" as applying to the first general election that shall be held in any county not now possessing the distinctive features, after it shall hereafter acquire those features. In view of the fact that section 18 provides for public notice to be given to the electors in advance of the election, the submission to counties hereafter acquiring the physical features would be accompanied by sufficient publicity.

Nor, with respect to those counties that now possess the bodies of fresh water contemplated by the act, is the option of acceptance limited by time. The emphatic portion of section 18 is "that none of the foregoing provisions shall take effect in any county *until the acceptance or rejection of this act shall have been submitted as herein provided to a popular vote.*" The words "as herein provided" plainly refer to the method of submission which is prescribed by the same section with some particularity, and do not refer to the date of submission. The section proceeds to provide that "such submission shall be made and the vote hereinafter provided for taken at the next election, whether general, municipal or special, wherein the people of the county qualified to vote are authorized to vote for local officers;" then proceeding to impose upon the county clerk the duty of giving public notice, preparing and distributing ballots, &c. And further on in

the same section it is provided that "the acceptance or rejection of this act shall be determined by the result of such election."

Section 19 provides that "this act shall take effect immediately as regards the submission thereof to a popular vote as aforesaid."

The provision that the act shall not take effect until the people have voted yes or no is obviously and necessarily mandatory. The insistment of the prosecutor is that the next following clause, viz., that calling for a submission at the next election, is mandatory, so that submission at that particular time is essential. This insistment overlooks the fact that it is rhetorically impossible to adopt a mandatory sense both for the requirement that the act shall be submitted in the manner prescribed, and also for the requirement that the act shall be submitted at the next election. For, to say that the act shall not take effect until submitted, and at the same time to say that it has taken effect and its force has been spent because not submitted within a limited time, is a manifest contradiction.

We hold that, with respect to imposing a duty upon the county clerk and election officers to prepare for and hold an election, the effect of the act is immediate and imperative, and the duty continues until it is performed. For other purposes the act does not take effect in any county until that duty has been performed, and the question of acceptance or rejection has been submitted to the people in the manner contemplated by the act. It is not essential that the question shall have been submitted at the appropriate election held next after the passage of the act. The referendum clause is mandatory in the requirement that the act shall be submitted to the people substantially in the method prescribed; it is directory with respect to the time of such submission. It must be very plain language that would justify the courts in so construing a referendum clause as to put it within the power of a ministerial officer to nullify the act; especially where the same construction must lead to the conclusion that the referendum is illusive, and the act is therefore special, and for that reason

unconstitutional and totally void. No language requiring such a construction is to be found in this act. We therefore hold that the neglect or failure of the county clerk and election officers in any county to perform their duties in such manner as to test the sense of the people at the precise time contemplated by the legislature cannot defeat the will of the legislature, or deprive the people of the option of acceptance granted by the act. Undoubtedly the reference to the "next election" is designed to secure prompt submission of the question to the people at the next election after the act, with respect to those counties then possessing the requisite features, and at the first available election with respect to such counties, if any, as may afterwards come to possess the requisite features. The section, however, requires not only a prompt submission of the question to the people, but it requires that such submission shall be after adequate advertisement and the preparation of an adequate number of official ballots and their distribution among the proper election officers so as to reach the people. A *bona fide* submission of the question to the people, and its actual acceptance or rejection, are what the legislature contemplated. It is quite conceivable that, owing to accident or design, an election might be held in such manner as not fairly to test the sense of the county in the manner provided by the act; and, in a plain case, such an election might be declared void. Such an abortive election would hardly be construed as debarring the people from subsequently availing themselves of the option, if they saw fit to do so. But, without discussing this question, we are clearly of the opinion that section 18 has not the effect of absolutely requiring that the submission to a vote shall be at the next general election after the adoption of the act, nor has it the effect of excluding from the class those counties that have not heretofore acted upon the question. In those counties now having the necessary features to bring them within the general class, where, by reason of the failure of the public officials to take the necessary steps, or from any other cause, the voters have not yet voted, *pro* or *con,* upon the question of adoption, it is still in order for the act to be submitted to the people, and a *mandamus* would lie, at the instance of

persons interested, requiring the proper officials to advertise, prepare for and conduct the election.

Before leaving this branch of the case it is proper to remark that the statute now under consideration, in its general features, and especially in the provisions respecting submission of the question of adoption or rejection to a popular vote, is hardly to be distinguished from the "Act to establish public parks in certain counties of this state," approved March 5th, 1895. *Pamph. L., p.* 169; *Gen. Stat., p.* 2618; supplements in *Pamph. L.* 1898, *p.* 19; *Pamph. L.* 1899, *p.* 92. It is a matter of judicial history that, under this statute, at least one of the great counties of the state has voted to adopt the system of parks therein provided for; that the park commission thereupon created has exercised, with the sanction of our court of last resort, its power to require the board of chosen freeholders of the county to issue bonds to the amount of a half million dollars in order to meet the expenses incurred by the commission (*Freeholders of Essex* v. *Park Commission,* 33 *Vroom* 376), and that the commission has acquired lands by resorting to the powers of condemnation conferred by the act. *Rimback* v. *Essex Park Commission, Id.* 494. And although this great enterprise has been carried on at public expense, under circumstances requiring contentious litigation to enforce the authority of the commission, it seemingly has not occurred heretofore, either to the bench or to the bar or to any of the numerous class of persons interested in obstructing the enforcement of the act, that the statute was null and void by reason of the supposed limitation of time fixed for its adoption. Yet in the *mandamus* case (*Id.* 376) the question turned upon the validity of an election held under the referendum clause of the supplement of 1898, where the term "next election" is used without any express language accompanying it to extend its construction.

In the recent case of *Renner* v. *Holmes, ante p.* 192, Mr. Justice Dixon, speaking the views of this court, drew attention to the distinction between the Park act of 1895, on the one hand, and the statutes that were condemned in the De Hart and Renner cases, on the other.

The next ground of attack upon the constitutionality of the present act is that it makes an invalid delegation of municipal powers. The cases cited in support of this contention (*Bingham* v. *Camden,* 11 *Vroom* 156; *Alexander* v. *Elizabeth,* 27 *Id.* 71; *Hammer* v. *Richards,* 15 *Id.* 667) are not pertinent. They touch, rather, upon the point that legislation of the character now under examination must be general in its operation, a point already sufficiently covered. If the statute before us confers powers that may properly be called municipal powers, they are conferred upon a new body politic, whose limited functions are to be performed within and for an exisiting political division. It is not perceived that any objection can be suggested to this scheme on constitutional grounds that will not be found fully met and answered in the recent decision of the Court of Errors and Appeals in *Allison* v. *Corker,* 38 *Id.* 596.

It has already been observed that the creation of a body corporate seemed necessary, in the wisdom of the legislature, to carry out and execute the public trust contemplated in the act. Indeed, there may be room for the contention that without the intervention of such a trustee the legal title to the rights in question could not be acquired or held. A right of fishery is a right of *profit a prendre,* and the underlying reason for the established rule that such rights cannot be claimed by the public under a custom is that such a custom would be void for indefiniteness with respect to the persons entitled to enjoy the right. Such rights are said to lie in grant, and a claim to their enjoyment resting on ancient usage was at common law necessarily made under a prescription, which presupposed a grant that had been lost. Inasmuch as the history of this state does not extend back to time immemorial (*Albright* v. *Cortright,* 35 *Vroom* 332, and cases cited), a common law prescription is impossible with us. By analogy to our statutes of limitation, however, the same result is reached by a plea expressly setting up a lost grant, the averment being supported by an adverse user for more than twenty years under appropriate conditions. But it will be seen that whether under the common law prescrip-

tion or under our plea of lost grant, there is a qualification inherent in the subject-matter of a *profit a prendre*—that is, it rests in grant, and so must be pleaded under a grant, actual or supposed, and supported either by production of the·deed or by evidence consistent with a lost deed.

The foregoing considerations apply not only to a common of fishery, but also to a common fishery, which is a very different thing; the former being a right held by an individual in common with the owner of the soil covered by the water in question (*Co. Litt.* 122a), the latter being a public or common right, which is or may be exclusive of the owner of the soil. *Benett* v. *Coster,* 2 *Moo.* 83; 8 *Taunt.* 183; *Bac. Abr., tit. "Pischary."* Sir William Blackstone, indeed, while he classifies the "common of fishery" among the rights of *profit a prendre* that are capable of being held by private grant or prescription (2 *Com.* 34), seems inclined to treat a "free fishery" as a species of royal franchise, conferring upon a citizen an exclusive right of fishing in a public river. 2 *Com.* 39, 40. But in this he is criticised by Mr. Hargreave in *Co. Litt.* 122a, *note* 7, who seems to think the term "free fishery" may appropriately be used to designate a common or public fishery.

Certainly the sort of fishing rights that were attempted to be set up in Cobb *v.* Davenport and Albright *v.* Cortright were common rights in the sense of being open to the inhabitants in general; and it was rights of this sort that the court decided could not be claimed under a custom, but must arise by grant or prescription. In either of the latter modes of acquiring title there arises the necessity for a grantee capable of accepting the grant. A mere easement may be acquired by the public by custom or dedication, which needs not a certain grantee. But with a right of *profit a prendre,* public or private, it is otherwise. The English law upon the subject is to be found principally under the head of "Prescription," because actual grants were the rare exception; grants presumed from long user, the rule. It was early recognized that while a custom of *profit a prendre* laid in the inhabitants of

a district was void for uncertainty and unreasonableness, a prescription laid in a body politic or corporate was good, and would justify a user of the right by any member of the corporation. *Co. Litt.* 113*c; Washb. Easm. & Serv.* \*73, \*82, \*125 *et seq.; Constable* v. *Nicholson,* 14 *C. B.* (*N. S.*) 230; 32 *L. J. C. P.* 240; 8 *Eng. Rul. Cas.* 337.

There being, *in esse,* a corporation clothed by law with the power to take the rights in question and hold them for the benefit of the inhabitants or others of the public entitled thereto, the trust is enforceable as a public use, notwithstanding any legal or technical indefiniteness in the beneficiaries. The "public use," and the "charitable trust," are in this respect closely analogous. *Pom. Eq. Jur.,* § 1018 *et seq.*

It is next insisted that the right of fishing in the fresh-water lakes of this state is a private right and not a public use. A concise answer to this contention is that the manifest purpose of this act is to impress a public use upon this private right, or rather to extinguish the private right and replace it with a public right. In *Arnold* v. *Mundy,* 1 *Halst.* 1, it was held that the tidal waters of this state are public property, and the right of fishery therein is common to all the people. In *Cobb* v. *Davenport,* 3 *Vroom* 369, it was held that the soil under the fresh-water lakes was formerly in the proprietors and not in the state, and may be acquired by individual owners under grant from the council of proprietors; and with respect to these waters it was held that the exclusive right of fishery was not common property, and could not be acquired by the general public by custom; that, *prima facie,* this right belongs exclusively to the owner of the soil covered by water, but may be acquired separate from the ownership of the soil by grant or prescription. The law thus laid down has been placed beyond dispute in this state by the decision of the Court of Errors and Appeals in *Albright* v. *Cortright,* 35 *Id.* 330. But the discussion in these cases related to the question whether the ownership of the right of fishery in the non-tidal waters of this state is *prima facie* in the owner of the soil covered by the water. The question whether it is

within the competency of the legislature to take that private property for public use is an entirely different question, and, of course, is beyond dispute.

The next question is whether the use to which the rights of fishery and the property held in connection therewith are to be devoted, under the scheme proposed in this statute, amounts to a public use. So far as this is a judicial question, it is, in our judgment, not debatable. The title of the act shows its main purpose to be the acquisition of "rights of fishing common to all," a phrase which, as already explained, relates to the *status* of the rights after acquisition, and indicates, with the utmost clearness, the purposes for which they are acquired. The commissioners provided for by the act are created a body politic; the members are to serve without compensation; their expenses and disbursements are to be paid for out of the public funds. By section 2 they are authorized to acquire, maintain and make available to the inhabitants of the county, and to the public, rights of fishing common to all in fresh-water lakes within that county having an area of water surface exceeding one hundred acres, and lands not exceeding ten acres adjoining thereto and within the county for public use and enjoyment therewith. And it is made the duty of the commissioners to preserve and care for the rights of fishery, and to care for and improve the lands adjoining the lakes. For these purposes they are invested with the powers of purchase and condemnation. That, under this scheme, any and every citizen of the county would have an equal right to resort to the lakes and parks and to enjoy the fishing privileges therein, subject only to reasonable regulations, to be prescribed by the commissioners, and to the general laws of the state for the protection of fish and game, admits of not the slightest doubt. That this constitutes a public use is entirely well settled.

Whether, for a given public use, the legislature will authorize the exercise of the power of eminent domain, is a legislative question and not a judicial one. *National Docks Railroad Co.* v. *Central Railroad Co.,* 5 *Stew. Eq.* 755, 763; *Olmsted* v. *Proprietors of Morris Aqueduct,* 18 *Vroom* 311, 329.

If private lands may be taken for public use as a park for general purposes of popular recreation, it is perfectly plain that they may be taken for purposes of a park with the incidental rights of a public fishery.

Mr. Randolph's treatise on the law of "Eminent Domain" (*Rand. Em. Dom.,* § 41 *et seq.*) and other recent text-books on the subject, contain ample reference to the great variety of public uses for which the power of eminent domain has been called into play.

The argument urged here that the right to take fish is not an easement, but a *profit a prendre,* goes only to the question, what interest in lands may be taken for the public use. A right to take the very products of the soil is, of course, a greater interest than a mere easement, such as a right of passage or the like. But, as the constitution authorizes land to be taken, the authorization necessarily justifies a taking either of the fee or of any interest in land less than the fee. A limitation of the interest taken to that which the public use requires, is manifestly just and constitutional. *Hepburn* v. *Jersey City,* 38 *Vroom* 114; *S. C., Id.* 686.

This disposes of all the objections that were raised concerning the constitutionality of the act.

The final reason relied upon for reversal of the order appointing commissioners is that the acceptance or rejection of the act was not submitted to popular vote at the next election, whether general, municipal or special, wherein the people of the county, qualified to vote, were authorized to vote for local officers. This objection is unfounded in fact. The statute was approved March 22d, 1901, and, by section 19, it took effect immediately with respect to the submission thereof to popular vote. It was submitted at the general election of November 5th, 1901. There is nothing in the case to show that in the meantime any election was held in Sussex county at which the question of acceptance could properly be submitted. The general township elections were held on the second Tuesday of March (*Pamph. L.* 1899, *p.* 373), and so, of course, preceded the approval of the act. There may be in

that county certain municipalities that held elections for choice of local officers between the date of approval and the general November election. Upon this point the evidence before us and the briefs of counsel are silent. But section 18 of the act before us provides, as we think, for the submission of the question at an election, whether general, municipal or special, wherein *the people of the county* are authorized to vote for local officers. This refers to officers which are local to the county, and not those which are local to a township or other municipality within the county. The purpose was to have the act submitted at the first election held throughout the county in which the entire voting population of the county would be interested. The machinery of the act is the county machinery, and the expenses are to be borne from the county treasury. The November election, so far as appears, was the first election of the sort held after the approval of the act.

But, for reasons already given, we deem it quite unnecessary to pursue the inquiry whether the people of Sussex county correctly chose the date upon which this matter should be submitted to the popular vote. The facts show conclusively that they have, in good faith, expressed themselves. The population of the county, according to the last federal census, is twenty-four thousand one hundred and thirty-four, and the case shows that five thousand and eighty-eight ballots were cast upon this question, of which only one hundred and twenty-eight were rejected for informality or otherwise. There is not the slightest suspicion that the will of the people has not been fully and fairly expressed in accordance with the letter and spirit of the act.

The order brought up for review by this writ will be affirmed, with costs.